UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re                                           )
                                                )
                                                )   Chapter 11
SOURCE PRECISION MEDICINE, INC.,                )   Case No. 04-_11565_ (__)
                                                )
                    Debtor.                     )
                                                )

## MOTION FOR ORDER UNDER 11 U.S.C. §§ 363 AND 364 AUTHORIZING DEBTOR-IN-POSSESSION FINANCING, CASH COLLATERAL USE, AND ADEQUATE PROTECTION IN CONNECTION THEREWITH

### Preliminary Statement

Source Precision Medicine, Inc., debtor and debtor-in-possession herein (the "Debtor"), hereby moves this Court (the "Motion"), pursuant to Bankruptcy Code sections 363 and 364 and Bankruptcy Rule 4001, to enter an Order: (a) authorizing the Debtor to incur secured indebtedness substantially upon the terms and conditions set forth in the attached term sheet (attached hereto as <u>Exhibit A</u>) (the "DIP Term Sheet") with Boulder Creek Partners, LLC (the "DIP Lender"); (b) authorizing the Debtor to use so-called "cash collateral" and affording adequate protection to each of the holders of the Debtor's unavoidable Convertible Secured Notes in connection therewith; and (c) scheduling a final hearing on this Motion and prescribing the form and manner of notice. In order to ensure that sufficient working capital is available to support the Debtor's postpetition operations, the DIP Lender has agreed make a debtor-in-possession loan of up to $2,000,000 (the "DIP Loan"). The DIP Loan proposed hereby will enable the Debtor, its employees and its customers and creditors to maintain a constant, uninterrupted working relationship, thereby maximizing the Debtor's prospects for confirmation and consummation of its reorganization plan. In connection with the DIP Loan, the Debtor must

451/451.000-3245

continue to have the use of its postpetition revenues, which may constitute cash collateral as that term is defined in section 363(a) of the Bankruptcy Code. Accordingly, by this Motion, the Debtor seeks approval for its continued use of cash collateral upon the terms and conditions set forth herein. In further support of this Motion, the Debtor respectfully represents as follows:

### Jurisdiction And Venue

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. sections 157 and 1334.

2. Venue is proper in this District pursuant to 28 U.S.C. sections 1408 and 1409.

3. This is a "core" proceeding pursuant to 28 U.S.C. section 157(b).

### Background

4. On May 25, 2004 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.

5. The Debtor continues in possession of its property and continues to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed in this case.

7. Prior to the Petition Date, the Debtor was established and commenced operation in the biopharmaceutical research and development industry. The Debtor is incorporated under the laws of the State of Delaware. The Debtor leases its principal and only location in Boulder, Colorado, where it maintains approximately 31,000 square feet of laboratory and office space.

8. The Debtor is an emerging growth/molecular medicine company founded in 1998 providing services to the biotech and pharmaceutical industry. To date the Debtor has revenue of about $2.4 million and an accumulated deficit of more than $25 million. The company has been undercapitalized for over two years based on its inability to raise sufficient capital to sustain its business, in part, due to a balance sheet with over $14 million of debt and accumulated interest. Recent discussions with potential venture capital investors have pressured the Debtor to recapitalize its balance sheet before they will consider any investment in the Debtor. Likewise, the Debtor's major customer has indicated that the Debtor must recapitalize its balance sheet in order to continue as a key vendor.

9. The Debtor has devoted its resources and skills to the development of the fully integrated, high precision molecular system, called TheraTrax™, to track human disease and therapeutic response at the cellular level for inflammation, vascular disease, skin responses, infectious disease, cancer, and hormonal/metabolic diseases. To date, the Debtor has completed or is working on projects for various pharmaceutical and biochemical companies for inflammatory, immunological and infectious diseases such as rheumatoid arthritis, lupus, inflammatory bowel disease, psoriasis, multiple sclerosis, transplant rejection, bacterial infections and viral infections. TheraTrax is designed to dramatically improve decision-making in drug development and patient care, and is based on: (i) high-precision molecular assays (Precision Profiles®); (ii) a growing molecular medicine knowledge base (databases and algorithms); and (iii) integrated software tools. The Debtor's experienced team of medical scientists and technology experts has spent the past five years building, testing and refining TheraTrax.

10. To date, the Debtor has not had sufficient capital to pursue the commercial development of molecular diagnostic products. Since its inception, however, the Debtor has realized its patented molecular medicine technology can also be applied to the development of clinically validated disease biomarkers, which in turn can be the basis for molecular diagnostics products across multiple diseases. The Debtor intends to focus on the commercialization of diagnostic products for inflammatory, immunologic and infectious diseases based upon the use of the TheraTrax system to develop and validate high precision molecular biomarkers.

11. The Debtor believes that the market for molecular diagnostics products is a major commercial opportunity with higher revenue and profit potential than its current fee-for-service business with biopharmaceutical companies. The Debtor's patented TheraTrax system, its expertise in inflammatory, immunologic and infectious diseases, and its relationships with leading biopharmaceutical companies together form a solid scientific and technologic foundation on which to build a successful molecular diagnostics business.

12. Together with its petition and related "first-day" motions, the Debtor has filed its plan of reorganization (the "Plan") and disclosure statement relating thereto (the "Disclosure Statement"), by which the Debtor proposes to recapitalize its balance sheet and restructure its operations. The Debtor intends to confirm its Plan as expeditiously as possible to preserve and maximize the value of the Debtor's business.

13. As of the Petition Date, the Debtor's assets consisted primarily of cash and cash equivalents, accounts receivable, equipment, and intellectual property.

14. The Debtor's operations focus almost exclusively on the exploitation of its intellectual property. A budget, illustrating the Debtor's projected cash flow term of the proposed DIP Loan ending in September, 2004, is attached hereto as Exhibit B.

## The Prepetition Indebtedness

15. Source issued Convertible Secured Notes in the original aggregate principal amount of $2,585,000 (collectively, the "Convertible Secured Notes"). Each Secured Note is payable on the second anniversary of the issuance date and bears interest at the rate of ten percent (10%) per annum, also payable on the second anniversary of the issuance date. As security for repayment of the amounts outstanding under the Secured Notes, the Debtor granted each holder (collectively, the "Convertible Secured Note Holders") a first-priority security interest in and to all of the Debtor's assets including, but not limited to accounts, deposit accounts, equipment, fixtures, general intangibles (including intellectual property rights), goods, inventory, and the proceeds thereof (collectively, the "Collateral"). According to a lien search conducted by the Debtor prior to the Petition Date, on May 2, 2003, holders of Convertible Secured Notes filed a financing statement perfecting their security interest in and to the Collateral. In April 2004, amendments to that original financing statement were filed adding as additional secured parties noteholders who made loans to the company between May 6, 2003 and October 31, 2003 totaling $785,000. As a result of the bankruptcy filing, the Debtor believes that the liens perfected in April 2004 are avoidable pursuant to section 547 of the Bankruptcy Code. Therefore, those Convertible Secured Notes for which the liens were perfected in April 2004 (the "Avoidable Convertible Secured Notes") will not be Allowed Convertible Secured Note Claims, but rather will be treated as unsecured, as discussed further in the Debtor's Disclosure Statement. As of the Petition Date, the balance outstanding under the valid and perfected Convertible Secured Notes (i.e., not constituting Avoidable Convertible Secured Notes) was $1,945,007, comprised of $1,800,000 in principal and $145,007 in accrued interest. The balance under the Avoidable Convertible Secured Notes was $843,443, comprised of

$785,000 in principal and approximately $58,443 in accrued interest. Under the Convertible Secured Notes, the Debtor also issued stock warrant certificates to purchase shares of the Debtor's Common Stock.

16. Between October 5, 2001 and April 16, 2002, Source issued Convertible Senior Subordinated Notes in the original aggregate principal amount of $10,000,000 (collectively, the "Convertible Subordinated Notes") (with respect to the holders of the Convertible Subordinated Notes, the "Convertible Subordinated Note Holders"). One half of the principal amount of each Convertible Subordinated Note is payable on or before the fourth anniversary of the issuance of that note. The Convertible Subordinated Notes bear interest at the rate of eight percent (8%) per annum, which interest is payable, along with the other half of the principal due under each Convertible Subordinated Note, on the fifth anniversary of the issuance of the Convertible Subordinated Notes. The Convertible Subordinated Notes are subject to mandatory conversion into stock in the event that Source obtains external equity financing in excess of $10,000,000. As of the Petition Date, the balance outstanding under the Convertible Subordinated Notes was approximately $11,958,000, comprised of $10,000,000 in principal and $1,958,000 in accrued interest. Under the Convertible Subordinated Notes, the Debtor also issued stock warrant certificates to purchase shares of the Debtor's Common Stock.

## The Proposed DIP Loan

17. As of the Petition Date, the Debtor had no unencumbered cash or liquid resources with which to finance its operations. In order to ensure that adequate working capital is available to support its postpetition operations, the Debtor has requested and the DIP Lender has agreed to fund a postpetition term loan upon the terms set forth in the DIP Term Sheet.

18. Given its urgent need for working capital, the Debtor hereby requests the entry of Interim and Final Orders granting it the authority to obtain debtor-in-possession financing on the terms and conditions set forth in the attached DIP Term Sheet.

19. By this Motion, the Debtor seeks the Court's authorization, pursuant to sections 105, 363 and 364 of the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to obtain from the DIP Lender cash advances upon the conditions set forth in the DIP Term Sheet by and between the Debtor and the DIP Lender, which advances will be used to fund general working capital needs of the Debtor for the remainder of these chapter 11 proceedings. The principal elements of the DIP Term Sheet are summarized as follows[1]:

| Term Loan: | A secured term loan in the amount of $2,000,000. |
|---|---|
| Interest Rate: | Borrowings under the DIP Loan shall bear interest at 10.0% per annum. |
| Maturity: | The earlier of a Termination Event or November 30, 2004. |
| Security: | A security interest in and a lien upon all of the Debtor's assets (except for claims arising under chapter 5 of the Bankruptcy Code), which security interest and lien shall be subordinate to that of the unavoidable Convertible Secured Notes but shall be senior to any lien or security interest held by any other party. |
| Priority: | The liabilities under the DIP Loan shall constitute, in accordance with section 364(c)(1) of the Bankruptcy Code, a claim against Debtor's estate with priority as an administrative expense under sections 503(b), 507(a)(1) and 507(b) of the Bankruptcy Code. Said priority shall be senior to any other administrative expense in the chapter 11 case of the kind specified |

---

[1] The discussion contained herein is intended as a summary of the terms and provisions of the DIP Loan. To the extent there is any discrepancy between the DIP Loan Agreement and this Motion, the terms of the DIP Loan Agreement shall control.

|  | in Bankruptcy Code sections 503 and 507. |
| --- | --- |
| Carve Out: | The DIP Lender's claims, security interests and liens upon the Collateral shall all be subject and subordinate to the Carve-Out (as defined below) and fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. section 1930(a). |

20. The Debtor further requests, pursuant to section 364 of the Bankruptcy Code, as applicable, that the financing provided in connection with the DIP Loan be accorded a lien against all of the Debtor's assets except avoidance and other claims arising under Chapter 5 of the Bankruptcy Code status, which lien shall be subordinate to the unavoidable Convertible Secured Notes but have priority over all other secured claims, if any, any and all administrative expenses, including, without limitation, any adequate protection-related claims and any other claims of the kind specified in sections 105, 503(b), 507(a), 507(b), and 1114 of the Bankruptcy Code. In addition, the liens granted to secure the DIP Loan will be subordinated to: (a) the statutory fees of the United States Trustee provided for in 28 U.S.C. section 1930(a) (the "U.S. Trustee Fees"); and (b) to the extent approved by Order of this Court, the fees and expenses of duly-retained professionals up to a maximum of $100,000 prior to the maturity date pursuant to the DIP Term Sheet, and an additional $50,000 subsequent to the maturity date (the "Carve Out").

21. Pursuant to Bankruptcy Rule 4001, the Debtor seeks an interim hearing (the "Interim Hearing") on the Motion to consider entry of an interim order (the "Interim Order") authorizing the Debtor, inter alia, to obtain the financing contemplated in the Term Sheet on an interim basis, and further requesting that a final hearing (the "Final Hearing") thereafter be held before this Court to consider entry of a final order (the "Final Order") authorizing the financing contemplated by the DIP Term Sheet on a final basis.

## Use Of Cash Collateral

22. The Debtor also proposes to use its cash-on-hand and the proceeds of its accounts receivable to fund its current operations. As adequate protection for the postpetition diminution, if any, in the value of the Collateral securing the Convertible Secured Notes, the Debtor will grant the holders of the unavoidable Convertible Secured Notes replacement liens upon the same types of property as they had on the Petition Date.

## The Debtor's Need For Postpetition Financing And Proposed Terms And Conditions Thereof

23. The Debtor's chances for a successful reorganization are dependent upon its ability to continue funding its day to day working capital needs. As noted above, on the Petition Date, the Debtor had no unencumbered cash or other resources with which to support its post-petition operations. Under the DIP Loan proposed hereby, the DIP Lender will make $2,000,000 of working capital available to the Debtor. As illustrated by the attached Budget, the DIP Loan will afford the Debtor through the end of September to obtain confirmation and implementation of its Plan.

24. The Debtor has an immediate need for postpetition financing in order to continue operation of its business during these chapter 11 proceedings, to preserve and maximize the value of estate assets for the benefit of all prepetition creditors, and to consummate a plan of reorganization which will maximize returns for all stake-holders.

25. The Debtor is currently without sufficient unencumbered funds to pay ongoing day-to-day operating expenses. The DIP Loan proposed hereby is absolutely necessary to maintain the Debtor's ongoing operations, maximize the value of available assets, retain its specialized workforce, enhance the Debtor's reorganization efforts and avoid harm to its estate and creditors.

26. The Debtor submits that the proposed DIP Loan has been negotiated in good faith and at arm's length, with all parties represented by counsel, and is fair and reasonable under the circumstances of this case.

## **Approval Of The DIP Loan Is In The Best Interest Of The Debtor's Estate**

27. Ample justification exists herein for: (a) approval of the proposed DIP Loan; (b) entry of the Interim Order; and (c) authorization for the Debtor's continued use of cash collateral upon the terms and conditions set forth herein.

28. In the Debtor's business judgment, the DIP Loan is reasonable and will facilitate the Debtor's reorganization. Without approval of the borrowing contemplated under the DIP Loan Agreement, the Debtor will not have the working capital necessary to support its postpetition operations and the Debtor will not receive necessary support from its customers and critical suppliers. The Debtor has determined, therefore, that it requires a postpetition credit facility until it emerges successfully from chapter 11.

29. The DIP Lender is willing to make loans and other financial accommodations to the Debtor, but only in accordance with and on the terms set forth in the DIP Loan Agreement.

30. The DIP Loan is necessary to permit the Debtor to meet daily expenses, continue the operation of its business, and endeavor herein to maximize the value of its assets for the benefit of all creditors, and offers the Debtor the best possible chance for a successful reorganization.

31. In sum, the Debtor believes that good and sufficient cause has been and will be shown for the approval of the DIP Loan proposed herein, which will not prejudice the interests of any creditor or interested party. Approval of the relief requested herein will enable the Debtor to realize maximum value for its existing businesses and assets. Thus, entry of an interim and

final order approving the proposed DIP Loan is in the best interests of Debtor, its creditors, and other parties-in-interest in these chapter 11 proceedings.

32. The Debtor must have cash necessary to pay its postpetition obligations and continue to conduct its business without disruption. Any failure to maintain sufficient postpetition working capital would irreparably damage the value of the Debtor's business and assets, and cause substantial prejudice to its bankruptcy estate. The Debtor, therefore, respectfully requests that until a Final Hearing may be conducted, this Court enter an order approving and authorizing the DIP Loan.

## Notice

33. Notice of the Motion has been given to: (i) the United States Trustee; (ii) each of the holders of the Convertible Secured Notes[2]; (iii) each of the holders of the Convertible Subordinated Notes; (iv) counsel for the DIP Lender; and (v) the Debtor's twenty largest unsecured creditors. The Debtor submits that in light of the nature of the relief requested such notice is appropriate under the circumstances of this case and that no further notice is required.

## No Prior Request

34. No previous motion for the relief sought herein has been made by the Debtor to this or any other court.

---

[2] The terms "Convertible Secured Notes" and "Convertible Subordinated Notes" shall have the meanings ascribed to them in the Debtor's Plan of Reorganization filed on May 25, 2004.

WHEREFORE, the Debtor respectfully requests that this Court grant the relief requested herein and such other and further relief as the Court deems just and proper.

Dated: May 25, 2004

**LANDIS RATH & COBB LLP**

*/s/ Adam G. Landis*

Adam G. Landis (No. 3407)
Jamie L. Edmonson (No. 4247)
919 Market Street, Suite 600
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

- and -

**GADSBY HANNAH LLP**
Charles A. Dale III
John G. Loughnane
Alex F. Mattera
225 Franklin Street
Boston, Massachusetts 02110
Telephone: (617) 345-7000
Facsimile: (617) 345-7050

Proposed Counsel to Debtor and Debtor-in-Possession