UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | ) |
| | ) |
| | ) Chapter 11 |
| SOURCE PRECISION MEDICINE, INC. | ) Case No. 04-11565 (RB) |
| | ) |
| Debtor. | ) |
| | ) |

**SECOND AMENDED DISCLOSURE STATEMENT RELATING TO
THE SECOND AMENDED PLAN OF REORGANIZATION
OF SOURCE PRECISION MEDICINE, INC.**

LANDIS RATH & COBB LLP
Adam G. Landis (No. 3407)
Jamie L. Edmonson (No. 4247)
919 Market Street, Suite 600
P.O. Box 2087
Wilmington, DE 19899
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

-and-

GADSBY HANNAH LLP
Charles A. Dale III
John G. Loughnane
225 Franklin Street
Boston, MA 02110
Telephone: (617) 345-7000
Facsimile: (617) 204-8064

Counsel to Debtor and Debtor in Possession

Dated: July 27, 2005

DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES TO THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN SOURCE PRECISION MEDICINE, INC.

## I.    SUMMARY OF PLAN

The following introduction and summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement. All capitalized terms not defined in the Disclosure Statement have the meanings ascribed to such terms in the Plan.

### A.    Treatment of Claims and Interests Under the Plan

Under the Plan, Claims against, and Interests in Source Precision Medicine, Inc. are divided into five Classes. The table below summarizes the classification and treatment of these Claims and Interests under the Plan. For a more detailed description of the classification and treatment for all Classes, please see the section of this Disclosure Statement entitled "Classification and Treatment of Claims and Interests." Estimated Claim amounts are based upon Source Precision Medicine Inc.'s books and records. There can be no assurance that the estimated amounts below are correct and the actual allowed amount of Claims may be significantly different from the estimates.

| Class Description | Treatment Under Plan |
|---|---|
| DIP Loan Claim<br><br>Estimated Allowed Amount:<br>$2,300,000, plus accrued interest | Except as set forth below, on the Effective Date, each holder of a DIP Loan Claim shall receive, Pro Rata, shares of New Series A Preferred Stock which, in the aggregate, represent 25% of the Fully Diluted Equity of the Reorganized Debtor. Funds advanced under the DIP Loan on or after June 17, 2005 shall be repaid in cash upon the Effective Date. |
| Class 1 – Allowed Convertible Secured Notes<br><br>Estimated Allowed Amount:<br>$1,945,007 | On the Effective Date, each holder of an Allowed Class 1 Claim shall receive, Pro Rata, together with holders of Allowed Class 2 Claims, shares of New Series A Preferred Stock, which, in the aggregate, represent 15% of the Fully Diluted Equity of the Reorganized Debtor. |
| Class 2 – Unsecured Claims of Avoidable Convertible Secured Notes<br><br>Estimated Allowed Amount:<br>$843,443 | On the Effective Date, each holder of an Allowed Class 2 Claim shall receive, Pro Rata, together with holders of Allowed Class 1 Claims, shares of New Series A Preferred Stock, which, in the aggregate, represent 15% of the Fully Diluted Equity of the Reorganized Debtor. For avoidance of doubt, from and after the Effective Date, the holders of Allowed Claims in Classes 1 and 2 shall own shares of New Series A Preferred Stock, which, in the aggregate, represent 15% of the Fully Diluted Equity of the Reorganized Debtor. |
| Class 3 – General Unsecured Claims (including the Claims of Convertible Subordinated Note Holders)<br><br>Estimated Allowed Amount:<br>$12,858,000 | On the Effective Date, each holder of an Allowed Class 3 Claim shall receive, Pro Rata, a beneficial interest in the Class 3 Trust, together with the right to participate as an Investor as set forth in Section 5.3 of the Plan. The Class 3 Trust shall hold shares of New Series A-1 Preferred Stock, which, in the aggregate, represent 10% of the Fully Diluted Equity of the Reorganized Debtor. |
| Class 4 – Preferred Stock Interests<br><br>Estimated Allowed Amount:<br>N/A | On the Effective Date, all Preferred Stock Interests shall be terminated and extinguished. |
| Class 5 – Common Stock Interests<br><br>Estimated Allowed Amount:<br>N/A | On the Effective Date, all Common Stock Interests shall be terminated and extinguished. |

**B.**     **Conditions Precedent**

There are certain conditions which must be satisfied before the Debtor can confirm the Plan. The Debtor must raise a minimum of $5,000,000 prior to confirmation to satisfy its obligations under the Plan and to support its post-confirmation working capital needs. In the event that this condition is not satisfied, the Debtor will not be able to consummate the Plan. Please see the section of this Disclosure Statement entitled "Conditions to Confirmation" for a list of all conditions to confirmation of the Plan.

**C.**     **Recommendation**

The Plan has been extensively negotiated between all major stakeholders, including the Debtor and its Official Committee of Unsecured Creditors. The Debtor and the Committee believe that the Plan represents the best way for creditors to maximize the return on their pre-bankruptcy Claims. Therefore, the Debtor and the Committee recommend that you vote to accept the Plan, so that it can be confirmed by the Bankruptcy Court and consummated quickly.

| | | |
|---|---|---|
| I. | SUMMARY OF PLAN | ii |
| II. | INTRODUCTION | 1 |
| III. | THE BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES | 2 |
| | A. Definitions | 2 |
| | B. Notice to Holders of Claims and Holders of Interests | 2 |
| | C. Solicitation Package | 3 |
| | D. Voting Procedures, Ballots and Voting Deadline | 3 |
| | E. Confirmation Hearing and Deadline for Objections to Confirmation | 4 |
| IV. | HISTORY OF DEBTOR | 5 |
| | A. Background | 5 |
| | B. The Source Approach to Molecular Medicine | 7 |
| | C. Source's Intellectual Property | 8 |
| | D. Customer Laboratory Operations | 12 |
| | E. Prepetition Indebtedness | 12 |
| |    1. The Convertible Secured Notes | 12 |
| |    2. The Convertible Subordinated Notes | 13 |
| | F. Interests in the Debtor | 13 |
| | G. Officers and Directors | 14 |
| | H. Assets and Liabilities | 14 |
| | I. Events Leading to the Debtor's Bankruptcy | 14 |
| |    1. Financial Performance | 14 |
| |    2. Problems with Current Capital Structure | 15 |
| |    3. Source's Business Model | 15 |
| | J. Pending or Contemplated Litigation | 15 |
| V. | THE CHAPTER 11 CASE | 16 |
| | A. Appointment of the Creditors' Committee | 17 |
| | B. Debtor-In-Possession Financing And Cash Collateral | 17 |
| | C. Employee Retention Program | 18 |
| VI. | SUMMARY OF THE REORGANIZATION PLAN | 18 |
| | A. Structure of the Plan, Valuation Methodology and Conditions Precedent | 19 |
| |    1. Structure | 19 |
| |    2. Conditions Precedent | 20 |
| |    3. Business Plan and Projections | 20 |
| | B. Classification and Treatment of Claims and Interests | 20 |
| |    1. Claims | 21 |
| |    2. Interests | 22 |
| VII. | TREATMENT OF UNCLASSIFIED CLAIMS | 23 |
| | A. Administrative Claims | 23 |
| | B. Priority Tax Claims | 24 |
| | C. DIP Loan Claim | 24 |
| VIII. | PROVISIONS FOR THE EXECUTION AND IMPLEMENTATION OF THE PLAN | 24 |
| | A. The Reorganized Debtor's Business Model | 24 |
| | B. Operational Accomplishments while in Bankruptcy | 28 |
| | C. Operation of Business/Retention of Management | 30 |

          1.    Board of Directors.................................................................................30
          2.    Management and Operation ..................................................................31
    D.   Cancellation of Common and Preferred Stock .................................................32
    E.   Issuance of New Series A Preferred Stock, New Series A-1 Preferred Stock and New
        Common Stock .............................................................................................32
          1.    Cancellation of Common Stock and Preferred Stock. ..........................32
          2.    Recapitalization of the Debtor; Sale and Issuance of New Series A Preferred
              Stock and Issuance of New Common Stock. .......................................33
          3.    Execution and Return of Stock Purchase Agreement. ..........................33
          4.    Establishment Of The Class 3 Trust .....................................................34
          5.    Section 1145 Exemption .......................................................................34
    F.   Post-Effective Date Operations of the Reorganized Debtor .............................34
          1.    Revesting of Assets...............................................................................34
          2.    Certificate of Incorporation and Bylaws ..............................................34
          3.    Operations of the Debtor Between the Confirmation Date and the
              Effective Date ......................................................................................34
    G.   Dissolution of the Committee ..........................................................................34
    H.   Distributions Under the Plan.............................................................................35
          1.    Allowance of Administrative Claims....................................................35
             a.   Professional Fees..........................................................................35
             b.   Other Administrative Fees ............................................................35
           2.    Time of Distributions............................................................................35
          3.    Delivery of Distributions ......................................................................35
          4.    Form of Distributions............................................................................36
          5.    Fractional Dollars.................................................................................36
          6.    Procedures for Treating and Resolving Disputed and Contingent Claims ..........36
             a.   Objections to Claims....................................................................36
             b.   No Distributions Pending Allowance............................................36
    I.    Discharges, Releases and Settlements of Claims..............................................37
          1.    Discharge of Debtor ..............................................................................37
          2.    Compromises and Settlements...............................................................37
          3.    Setoffs ..................................................................................................38
          4.    Exculpation and Limitation of Liability................................................38
          5.    Injunction .............................................................................................38
    J.    Executory Contracts and Unexpired Leases .....................................................38
          1.    Provisionally Assumed Contracts and Leases.......................................38
          2.    Rejected Contracts and Leases..............................................................39
          3.    Payments Relating to Assumption of Executory Contracts and Unexpired
              Leases...................................................................................................39
          4.    Rejection Damages Bar Date ................................................................40
    K.   Preservation of Causes of Action......................................................................40
IX.   CERTAIN FACTORS TO BE CONSIDERED ......................................................41
    A.   General Considerations.....................................................................................41
    B.   Conditions Precedent .......................................................................................41
    C.   Inherent Uncertainty of Financial Projections .................................................42

     D.   Insider Transactions ..................................................................................................42
X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......................42
     A.   Federal Income Tax Consequences to the Debtor.........................................................43
         1.   Cancellation of Indebtedness .................................................................43
         2.   Limitation on Net Operating Losses ......................................................43
     B.   Federal Income Tax Consequences to Holders of Claims ...........................................44
     C.   Federal Income Tax Consequences to Holders of Common Stock Interests ...............44
XI. FEASIBILITY OF THE PLAN AND THE BEST INTERESTS OF CREDITORS............44
     A.   Feasibility of the Plan .................................................................................................44
     B.   Acceptance of the Plan.................................................................................................45
     C.   Best Interests of Holders of Claims .............................................................................45
     D.   Liquidation Analysis ...................................................................................................46
     E.   Confirmation Without Acceptance Of An Impaired Class: The "Cramdown"
         Alternative....................................................................................................................47
     F.   Conditions to Confirmation .........................................................................................48
         1.   Conditions to Confirmation ....................................................................48
         2.   The Effective Date of the Plan................................................................49
     G.   Retention of Jurisdiction..............................................................................................49
XII. ALTERNATIVES TO THE PLAN ......................................................................................49
     A.   Continuation of the Chapter 11 Case ...........................................................................49
     B.   Alternative Plans of Reorganization ...........................................................................50
     C.   Liquidation Under Chapter 7 or Chapter 11 ...............................................................50
XIII. VOTING REQUIREMENTS ...............................................................................................50
     A.   Parties in Interest Entitled to Vote ..............................................................................52
     B.   Classes Impaired Under the Plan .................................................................................52
XIV. CONCLUSION.......................................................................................................................52
     A.   Hearing on and Objections to Confirmation................................................................53
         1.   Confirmation Hearing .............................................................................53
         2.   Date Set for Filing Objections to Confirmation.....................................53

APPENDICES.

APPENDIX A ................................................................Plan of Reorganization (exhibits excluded)
APPENDIX B ..............................................................................................................Projections
APPENDIX C ........................................................................................Summary of Historical Financials
APPENDIX D ..........................................................................................................Officers and Directors
APPENDIX E ..............................................................................................Liquidation Analysis
APPENDIX F................................................................................................................ Insider Claims

## II.    INTRODUCTION

Source Precision Medicine, Inc. ("Source" or the "Debtor") submits this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the United States Bankruptcy Code (the "Bankruptcy Code"), for use in the solicitation of votes on the plan of reorganization (the "Plan") proposed by the Debtor and filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), a copy of which is annexed to this Disclosure Statement as Appendix A (exhibits excluded).

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition history and the anticipated organization and operations of the Debtor. This Disclosure Statement also describes the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims or Interests in Impaired Classes must follow for their votes to be counted.

This Disclosure Statement and the Plan have been prepared by the Debtor, its management and professional advisors.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISK AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR, PLEASE SEE THE SECTIONS ENTITLED "SUMMARY OF THE REORGANIZATION PLAN" AND "CERTAIN FACTORS TO BE CONSIDERED".

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASE AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION. NOTWITHSTANDING THE FOREGOING, THE DEBTOR'S MANAGEMENT, TO THE BEST OF ITS KNOWLEDGE, BELIEVES THAT THE INFORMATION PRESENTED HEREIN IS TRUE AND ACCURATE.

## III. THE BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A. Definitions

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

### B. Notice to Holders of Claims and Holders of Interests

This Disclosure Statement is being transmitted to certain holders of Claims against and Interests in the Debtor. The purpose of this Disclosure Statement is to provide adequate information to enable you, as the holder of a Claim against or Interest in the Debtor, to make a reasonably informed decision with respect to the Plan prior to exercising your right to vote to accept or reject the Plan.

On _____, 2005, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable the holders of Claims against or Interests in the Debtor to make an informed judgment with respect to acceptance or rejection of the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN. This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Case.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS.

Except with respect to the projections set forth in <u>Appendix B</u> annexed hereto (the "Projections") and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date upon which the Court approves it and that may have a material impact on the information contained in this Disclosure Statement. The Debtor does not intend to update the Projections after the date upon which the Bankruptcy Court approves this Disclosure Statement; thus, the Projections will not

reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections. Further, the Debtor does not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement shall not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date upon which the Court approves the Disclosure Statement.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. The company's historical financial information was obtained from the Debtor's books and records. The company's financial projections have been prepared in the normal course of business by its Court-approved Chief Restructuring Officer, Karl Wassmann of Valuation Perspectives, Inc. under the assumption that a minimum of $5,000,000 will be invested in the company upon confirmation of the Plan, and the financial projections have been reviewed and approved by the Debtor's Board of Directors.

## C.      Solicitation Package

Accompanying this Disclosure Statement are copies of (i) the Plan, (ii) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time and place of the hearing to consider the confirmation of the Plan and related matters, and the time for filing objections to the confirmation of the Plan (the "Confirmation Hearing Notice"), and (iii) one or more Ballots to be used by you in voting to accept or to reject the Plan.

## D.      Voting Procedures, Ballots and Voting Deadline

After carefully reviewing the Plan, this Disclosure Statement and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. Please complete and sign your Ballot and return it to Kurtzman Carson Consultants LLC at the address indicated below.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN AUGUST 16, 2005, at 4:00 P.M. (THE "VOTING DEADLINE") BY KURTZMAN CARSON CONSULTANTS LLC, 12910 CULVER BOULEVARD, SUITE I, LOS ANGELES, CA 90066, ATTENTION: SOURCE PRECISION MEDICINE, INC. BALLOTING.

If you have any questions about (i) the procedure for voting your Claim or with respect to the packet of materials that you have received, or (ii) the amount of your Claim, or if you wish to obtain, at your expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d), an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact Kurtzman Carson Consultants, LLC, 12910 Culver Boulevard, Suite I, Los Angeles, California 90066, Attn: Source Precision Medicine, Inc., Telephone: (866) 381-9100.

FOR FURTHER INFORMATION AND INSTRUCTION ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE THE SECTION OF THIS DISCLOSURE STATEMENT ENTITLED "VOTING REQUIREMENTS."

## E.    Confirmation Hearing and Deadline for Objections to Confirmation

Pursuant to section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing for August 26, 2005 at 2:00 p.m. before the Honorable Randolph Baxter, United States Bankruptcy Judge at the United States Bankruptcy Court, District of Delaware, 824 North Market Street, Wilmington, Delaware. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are RECEIVED on or before August 19, 2005, at 4:00 p.m. by:

*Counsel for Debtor:*

> Landis Rath & Cobb LLP
> 919 Market Street, Suite 600
> P.O. Box 2087
> Wilmington, DE 19899
> Attn: Jamie L. Edmonson, Esq.
>
> Gadsby Hannah LLP
> 225 Franklin Street
> Boston, MA 02110
> Attn: Charles A. Dale III, Esq.

*Counsel for the Creditors' Committee:*

> Young Conaway Stargatt & Taylor, LLP
> P.O. Box 391
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, DE 19899-0391
> Attn: Michael R. Nestor, Esq.

*United States Trustee:*

> Office of the U.S. Trustee
> 844 King Street
> Suite 2207
> Wilmington, DE 19801
> Attn: William K. Harrington, Esq.

## IV.    HISTORY OF DEBTOR

### A.    Background

Source Precision Medicine ("Source" or the "Company") is the first life science company to discover and reduce to practice an RNA-based molecular diagnostic system to measure cellular gene expression from whole blood or tissue samples with sufficient precision to track an individual's current health, disease status and individual response to drug therapy. Source's biomarker and diagnostic product development efforts are focused on major inflammation, immune response and infectious diseases. Source has identified, analyzed and patented approximately 300 genes that are well known to drug developers and physicians to form the basis for biomarker panels for specific diseases including rheumatoid arthritis, multiple sclerosis, lupus, psoriasis, transplant rejection, and sepsis. Source has pioneered technology—the subject of issued and pending patents—that has the potential of being a cornerstone of the future practice of medicine based on molecular diagnostics predicted to grow at a compound annual rate of approximately 20.3% from $5.5 billion in 2004 to over $35 billion during the next ten years.

The assets of the Company are primarily intellectual property and the goodwill that the Company has developed over the past six years with leading pharmaceutical and diagnostics companies. However, the Company was forced to file for Chapter 11 bankruptcy protection in Delaware on May 25, 2004 based on the combination of a weak management team, an unprofitable R&D Service business model, and a debt-laden capital structure. In order to maximize the value of the Company's core assets, the interim management team has developed a new business strategy based on biomarker partnerships with leading pharmaceutical companies and a product licensing strategy for the molecular diagnostic patient care market similar to the royalty-based license agreement we recently executed with Becton Dickinson in the field of sepsis. We believe the pharmaceutical biomarker business for drug development should be viewed as a foundation to the ultimate goal of utilizing molecular diagnostics for patient care. The pharmaceutical biomarker drug development business can provide many benefits to the Company, including near term cash flow while the Company is developing its royalty based approach to the patient care market.

The new business strategy requires a recapitalization of the existing balance sheet including an investment of between $5,000,000 and $6,000,000 of new capital to satisfy the Company's obligations under a Plan of Reorganization to emerge from bankruptcy and to support its post-confirmation working capital needs. The reorganization plan is based on leveraging the Company's core assets led by new management as follows:

1.    **Broad-based Intellectual Property.** Source's IP covers foundational practices for molecular medicine, as well as disease and product specific issues with priority dates claimed back to 1999 and 2000 including Source's first issued omnibus patent (6,692,916, issued February 17, 2004) covering precision and calibration in the process of preparing and measuring gene expression data. Source has developed methods for measuring gene expression in ways that are significantly more accurate, reproducible, and consistent across panels of genes than were previously known or

5

thought possible. Moreover, Source has discovered that tracking these genes with Source's new methods reveal biological phenomena that were previously difficult or impossible to observe using traditional gene expression measurement techniques. Source's research has produced the discovery that there are normal levels of gene expression for various types of genes in a wide variety of circumstances, as well as characterized abnormal molecular patterns that define a variety of disease states. The Company recently received two notices of allowance for its second omnibus patent covering "Normal" human gene expression and the use of indices for patient care.

2. **Biomarker Panels for Drug Development.** Source has near term opportunities for expanded biomarker programs and strategic partnerships with several of its pharmaceutical clients including Pfizer, Lilly and Abbott Laboratories in the disease areas of inflammation, immune response and infectious disease. The Company has undertaken approximately 80 client projects totaling in excess of $8.8 million in revenue for over 30 pharmaceutical and biotechnology companies since inception in 1999. Biomarker panels can be utilized throughout the research and development pipelines for a variety of applications. Some of the potential applications include patient stratification during clinical studies, early disease identification, identifying individuals who respond best to specific medicines, accelerating the "go-no go" decision process in clinical studies, strategic drug placement, target discovery, and identifying the "right" medicines for the right individuals;

3. **Disease-Specific Molecular Diagnostic License Agreements for Patient Care.** Since 1999, Source has spent approximately $25 million to build its scientific platform and drive the first phases of molecular diagnostics product development. In April 2005, Source executed an exclusive IP royalty-based license agreement with Becton Dickinson in the field of sepsis. We believe that disease specific IP licensing opportunities exist in disease silos including rheumatoid arthritis, multiple sclerosis, lupus, transplant rejection, psoriasis and cardiovascular diseases. We plan to pursue such license agreements with the leading diagnostics companies including Roche, Abbott, Genzyme, Johnson & Johnson, Beckman-Coulter, Bayer Diagnostic, Becton Dickenson and GE Healthcare;

4. **New Management Team.** Source will be lead by the interim management team from Valuation Perspectives that negotiated the Becton Dickinson license agreement including Frank Haydu, as Chairman, Karl Wassmann, as CEO and William Tamul, as Controller. The immediate focus for Source's new management team will be on closing a strategic partnership with one of the leading pharmaceutical companies. In parallel, the Company will focus on licensing programs like the Becton Dickenson agreement around specific diseases with the leading diagnostics companies including Roche, Abbott, Genzyme, Johnson & Johnson, Beckman-Coulter, Bayer Diagnostic, Becton Dickenson and GE Healthcare. Source intends to keep the cash burn rate relatively low until the Company can execute on the pharmaceutical and diagnostic company partnership opportunities described above, although there can be no certainty that such partnerships or license agreements can be consummated. The management team will also include the key science and technical team that currently

6

runs the customer laboratory operations led by Bunki Davis, as VP Customer Lab, and the key sales and marketing team led by David Trollinger and Jim Walter.

Source is a Delaware company which was incorporated in 1998. Source's principal place of business is in Boulder, Colorado, where it leases a facility which has a total of approximately 11,000 square feet of laboratory and office space. Source employs approximately 12 people on a 30 hour work week basis, many of whom hold advanced degrees in science.

## B. The Source Approach to Molecular Medicine

The Source approach to molecular medicine in drug development and patient care depends on four key elements found throughout all branches of medicine:

- *Precision Measurements* – Source's Precision Profiles are focused gene panels (typically, 6 to 96 genes) that provide sensitive and reproducible measurements of an individual's gene expression. Strict attention to key technical factors including reagent design, plate production, instrument calibration and quality control allows the Source commercial laboratory to maintain very high repeatability standards (typical coefficients of variance 0.2% to 2%) across operators, production runs and time.

- *The "Normal" Pattern* - After minimizing the substantial variability that can result from sample handling, Source discovered that normal subjects have a common pattern of molecular expression in whole blood. This observation of a normal pattern surprised many investigators outside Source. Importantly, it brings gene expression closer to traditional vital signs, such as body temperature and blood pressure, for which normal patterns are essential to broad-based utility in drug development and medicine.

- *Well-defined Disease Patterns* - Source's high precision measurements and knowledge of the normal pattern has enabled the rapid determination of abnormal gene expression patterns in various disease settings. For example, the study of small numbers of rheumatoid arthritis and lupus patients quickly identified essential inflammatory genes that were abnormally expressed (up- or down-regulated) when compared to normal subjects.

- *The Ability to Track the Effect of Therapeutic Agents* - Perhaps most important of all, Source is now able to track the therapeutic response of patients with major inflammatory and immunological diseases and quickly determine whether or not the therapy is moving the patient toward the normal pattern.

To execute on this approach to molecular medicine Source has established an advanced technology platform with three integrated components: (1) high-precision molecular assays (Precision Profiles), (2) a growing molecular medicine knowledge base (datasets and algorithms), and (3) integrated software tools. Precision Profiles are Source's high-precision molecular assays for mRNA measurement in whole blood and other tissues. Using Precision Profiles,

Source has begun to build the essential molecular medicine knowledge base of gene expression in normal subjects, in patients with specific disease settings, and in patients (as well as cell-based models) responding to widely prescribed therapeutic agents. Interpretive algorithms are designed to provide drug development scientists and practicing physicians with a simple, straightforward analysis of an individual subject's condition and response to therapy. Source's experienced team of scientists and technology experts has spent the past five years building, testing and refining their approach to molecular medicine and the technology platform that supports it.

## C.    Source's Intellectual Property

Source has been working since 1999 to apply its expert technical and conceptual understanding of molecular medicine across a broad range of disease areas. The Company's patented technology enables it to measure gene expression at sufficiently high precision to give that data clinical utility. Using that technology, Source has established a growing human database on gene expression for both normal individuals and patients across a broad range of disease states and other characteristics, including data relating to disease progression over time and patient responses to specific treatments. The Company has also pioneered the development of a patented information technology system and algorithms that translate complex molecular data into useful medical information. A comprehensive patent strategy dating back to the Company's founding protects Source's technology and molecular tracking products.

**Source Precision Medicine is a technology leader in the emerging field of molecular medicine.** Source Precision Profiles technology provides molecular assays that quantitatively monitor disease activity and therapeutic response. These assays are based on high accuracy gene expression measurements and are backed by a growing molecular medicine knowledge system that includes comparative datasets on normal subjects, specific diseases and responses to commonly prescribed therapies. Using these quantitative assays, Source provides biomarker services to the world's leading pharmaceutical companies to support their drug development efforts. Going forward, the Company plans to partner with leading pharmaceutical companies to launch molecular biomarker panels that will improve the process of conducting clinical trials in drug development. The Company also plans to partner with leading diagnostics companies to launch molecular diagnostic products that will improve the therapeutic management of individual patients (e.g., better selection of dose, schedule and combination of therapeutic agents).

**Source's product development strategy is supported by a comprehensive patent strategy dating back to 1999.** This strategy is designed around two major components, which we refer to as 'foundational IP' and 'product-specific IP'. Specifically, the objectives of our strategy are:

1.  To provide a broad based IP foundation that enables the practice of molecular medicine. This objective includes key elements such as high-precision, calibrated gene expression measurements; comparator datasets (most importantly, Normals), and various methods of data capture, and analysis.

2.  To provide IP protection for specific molecular diagnostic products, including those targeting inflammation, immune response and infectious disease.

8

Source has pursued this strategy with multiple applications to the US Patent Office and foreign patent organizations. To date, one patent has been issued and ten other applications are currently pending. Source has received notice of allowability for two sets of claims for its foundation Normals patent. These applications lay out our foundational IP claims and provide early disclosures to support our product-specific claims.

**Foundational IP claims in the Source portfolio of patents and patent applications include**:

(i)     The use of precision and calibration in the measurement of response at the molecular and cellular level;

(ii)    The use of such measurement to evaluate a biological condition (including health or disease) of a subject;

(iii)   The use of such measurement directly or with respect to indicator cells to determine the effect of a drug or other stimulus on biological condition;

(iv)    The use of a set of defined genes to provide data about any biological condition;

(v)     The routing and handling of such measurement, including over the internet, to permit, for example, remote analysis of samples;

(vi)    The use of such measurement to determine subpopulations of individuals with a known biological condition;

(vii)   The use of such measurement to monitor the response of patients to therapy;

(viii)  The use of such measurement to assess the efficacy and safety of therapy, including in clinical trial settings;

(ix)    The use of such measurement to guide the medical management of a patient by adjusting therapy to bring one or more relevant molecular response measurements closer to a target set of values, which may be normative values or other desired or achievable values; and

(x)     The characterization and early identification (including pre-symptomatic states) of infectious disease.

**Source's first issued patent (6,692,916, issued February 17, 2004) covers precision and calibration in the process of preparing and measuring gene expression data.** Entitled "System and Method for Characterizing a Biological Condition or Agent Using Calibrated Gene Expression Profiles", this patent provides Source an important footprint in the area of gene expression analysis. Precision and calibration in gene expression measurements allow improved comparisons of data across subjects and time, thereby enabling the construction of Source's molecular medicine knowledge base. The claims are platform independent, thereby enabling use of this approach across different assay platforms, and facilitating cross platform comparisons. As

described below, a continuation-in-part (CIP) has been filed to extend the claims of this patent. In addition, the parent application of this patent has yielded seven divisional patent applications filings (see below).

**Source's "Normals" patent application has major implications for the practice of molecular medicine.** This patent filing entitled "Identification, Monitoring and Treatment of Disease and Characterization of Biological Condition Using Gene Expression Profiles" establishes the normal gene expression pattern in healthy subjects. It brings gene expression closer to traditional vital signs, such as body temperature, blood pressure or blood sugar, for which normal patterns are essential to broad-based utility in drug development and patient care. This patent application also includes numerous other foundational claims, and we have been notified by the Patent and Trademark Office of the allowability of claims under two separate applications.

### Summary of Applications Under Active Prosecution:

1. **Attorney Docket #112. Issued patent 6,692,916.** "System and Method for Characterizing a Biological Condition or Agent Using Calibrated Gene Expression Profiles". This application was filed on March 28, 2001 and is part of the foundational series of applications claiming inventorship over methods to arrive at precise and calibrated gene expression and the medical and pharmaceutical uses of such precise gene expression data. The patent also covers the use of panels of gene loci among other claims.

2. **Attorney Docket #130. A Continuation in Part Application issued patent #6,692,916.** This application was filed on February 17, 2004 and claims priority to June 28, 1999. This application extends the claims of 112. For example, among other claims, this application reduces the numbers genes required in patent #6,692,916 from 4 or more to 2 or more genes.

3. **Attorney Docket #119.** "Identification, Monitoring And Treatment Of Disease And Characterization Of A Biological Condition Using Gene Expression". This application is part of our foundational patent application series and claims the identification and the medical and pharmaceutical uses of normal gene expression values and ranges. It also discloses multiple disease specific applications. The application anticipates both nucleic acid and protein products of gene expression. The application extends the earlier foundational patent (patent # 6,692,916) with regards to multi-gene algorithms and applications to medicine and drug development. The application was filed on June 28, 2000 and claims priority back to June 28, 1999.

4. **Attorney Docket #122.** A 112 Divisional (patent # 6,692,916); Evaluating A Biological Condition Using A Calibrator: Identification, Monitoring And Treatment Of Disease And Characterization Of A Biological Condition Using Gene Expression; The application was filed November 08, 2002 and claims priority back to June 28, 1999 through provisional and non-provisional applications. The application claims inventorship over the use of a change in expression profiles as an evaluation of a biological condition among other claims.

5. **Attorney Docket #123.** A 112 Divisional (patent # 6,692,916); Evaluating A Biological Condition After Treating With An Agent: Identification, Monitoring And Treatment Of Disease And Characterization Of A Biological Condition Using Gene Expression. The application claims inventorship over the use of gene expression to evaluate and quantitatively measure the effect of pharmaceutical and nutraceutical agents whether cells or mammals are treated in vitro or in vivo among other claims. The application was filed on November 03, 2003 and claims priority back to June 28, 1999 through provisional and non-provisional applications.

6. **Attorney Docket #124.** A 112 Divisional (patent # 6,692,916); Evaluating A Biological Condition Through Use Of A Descriptive Record: Identification, Monitoring And Treatment Of Disease And Characterization Of A Biological Condition Using Gene Expression. This application was filed on February 5, 2004 and claims priority back to June 28, 1999. This application claims inventorship over the use of precise and calibrated gene expression to constitute a descriptive record of a biological condition and the medical and drug development uses of a descriptive record or library of descriptive records.

7. **Attorney Docket #125.** A 112 Divisional (patent # 6,692,916); Evaluating A Biological Condition Without A Calibrator: Identification, Monitoring And Treatment Of Disease And Characterization Of A Biological Condition Using Gene Expression. The application was filed on February 12, 2004 and claims priority to June 28, 1999. The application claims inventorship over the use of gene expression to quantitatively describe changes induced by body fluids or cells from a subject when applied to characterized indicator cells.

8. **Attorney Docket #126.** Identification, Monitoring and Treatment of Infectious Disease And Characterization of Inflammatory Conditions Related to Infectious Disease Using Gene Expression Profiles. This application was filed on December 19, 2003 and claims priority back to June 28, 1999 through provisional and non-provisional applications. This application claims inventorship over the use of gene expression in the diagnosis, prognosis and medical management of infectious disease caused by bacteria, viruses, fungi, or multi-cellular parasites and their related virulence products including toxins.

9. **Attorney Docket #127.** A 112 Divisional (patent # 6,692,916); Conducting A Clinical Trial: Identification, Monitoring And Treatment Of Disease And Characterization Of A Biological Condition Using Gene Expression. This application was filed on February 16, 2004 and claims priority back to June 28, 1999. This application claims inventorship over the use of precise and calibrated gene expression to characterize a change in a subject induced by pharmaceutical or nutraceuticals agents and the use of gene expression to select or characterize subjects likely or unlikely to respond to such agents among other claims.

10. **Attorney Docket #128.** A 112 Divisional (patent # 6,692,916); Storage In A Computer System: Identification, Monitoring And Treatment Of Disease And Characterization Of A Biological Condition Using Gene Expression. This application was filed on February 16,

2004 and claims priority back to June 28, 1999. This application claims inventorship over the use of specific and general methods of digital storage, electronic transfer and electronic comparisons of digital records of gene expression.

11. **Attorney Docket #129.** A 112 Divisional (patent # 6,692,916); Use In A Kit: Identification, Monitoring And Treatment Of Disease And Characterization Of A Biological Condition Using Gene Expression. This application was filed on February 16, 2004 and claims priority back to June 28, 1999. This application claims inventorship over the use of specific components for constructing a set of reagents for the precise and calibrated evaluation of gene expression.

12. **Attorney Docket #111.** A Quantitative Assay for Low Abundance Molecules. Filed June 16, 2000. This application is part of our foundational application series and claims inventorship over the use of nucleic acid aptamers to quantitatively measure and select low abundance molecules among other claims.

### D.     Customer Laboratory Operations

Source has approximately 7,500 square feet of laboratory space with individual laboratories for production, quality control, biology, new assay development, gene expression profiling and training. The Source commercial laboratory manufactures and performs quality control on all Precision Profiles for use on both internal research and development and client projects. The commercial laboratory operates under strict standard operating procedures (SOPs) from sample handling to data analysis and is moving towards full good laboratory practices (GLP) compliance. Attention to key technical factors including reagent design, plate production, instrument calibration and quality control allows the laboratory to maintain very high repeatability standards (typical coefficients of variance 0.2% to 2.0%) across operators, production runs and time. The laboratory currently processes and analyzes samples from clinical trials in the United States, Europe and Asia. All the employees in the customer laboratory are senior technicians with college degrees and/or doctorates in science.

### E.     Prepetition Indebtedness

#### 1.     *The Convertible Secured Notes*

Source issued Convertible Secured Notes in the original aggregate principal amount of approximately $2,585,000 (collectively, the "Convertible Secured Notes"). Each Convertible Secured Note is payable on the second anniversary of the issuance date and bears interest at the rate of ten percent (10%) per annum, also payable on the second anniversary of the issuance date. As security for repayment of the amounts outstanding under the Convertible Secured Notes, the Debtor granted each holder a first-priority security interest in and to all of its assets including, but not limited to accounts, deposit accounts, equipment, fixtures, general intangibles (including intellectual property rights), goods, inventory, and the proceeds thereof (collectively, the "Collateral"). According to a lien search conducted by the Debtor prior to the Petition Date, on May 2, 2003, certain holders of Convertible Secured Notes filed a financing statement perfecting their security interest in and to the Collateral. In April 2004, amendments to that original

financing statement were filed adding as additional secured parties noteholders who made loans to the company between May 6, 2003 and October 31, 2003 totaling $785,000. As a result of the bankruptcy filing, the Debtor believes that the liens perfected in April 2004 are avoidable pursuant to section 547 of the Bankruptcy Code. Therefore, those Convertible Secured Notes for which the liens were perfected in April 2004 (the "Avoidable Convertible Secured Notes") will not be Allowed Convertible Secured Note Claims, but rather will be treated as separate Class 2 Avoidable Convertible Secured Note Claims, as discussed further in the section of this Disclosure Statement Entitled "Classification of Claims and Interests."

The Convertible Secured Notes are convertible by their terms into shares of Common Stock at any time or into Preferred Stock under certain conditions. As of the Petition Date, the balance outstanding under all of the Convertible Secured Notes was $2,788,450, comprised of $2,585,000 in principal and $203,450 in accrued interest. The balance outstanding under the valid and perfected Convertible Secured Notes (i.e., not constituting the Avoidable Convertible Secured Notes) was $1,945,007, comprised of $1,800,000 in principal and approximately $145,007 in accrued interest. The balance outstanding under the Avoidable Convertible Secured Notes was $843,443, comprised of $785,000 in principal and approximately $58,443 in accrued interest. Under the Convertible Secured Notes, the Debtor also issued stock warrant certificates to purchase shares of the Debtor's Common Stock.

2. *The Convertible Subordinated Notes*

Between October 5, 2001 and April 16, 2002, Source issued Convertible Senior Subordinated Notes in the original aggregate principal amount of approximately $10,000,000 (collectively, the "Convertible Subordinated Notes"). One half of the principal amount of each Convertible Subordinated Note is payable on or before the fourth anniversary of the issuance of that note. The Convertible Subordinated Notes bear interest at the rate of eight percent (8%) per annum, which interest is payable, along with the other half of the principal due under each Convertible Subordinated Note, on the fifth anniversary of the issuance of the Subordinated Notes. The Convertible Subordinated Notes are subject to mandatory conversion into stock in the event that Source obtains external equity financing in excess of $10,000,000. As of the Petition Date, the balance outstanding under the Convertible Subordinated Notes was approximately $11,958,000, comprised of $10,000,000 in principal and approximately $1,958,000 in accrued interest. Under the Convertible Subordinated Notes, the Debtor also issued stock warrant certificates to purchase shares of the Debtor's Common Stock.

F. **Interests in the Debtor**

The Debtor's certificate of incorporation authorized the issuance of 80,000,000 shares of common stock, one cent ($.01) par value and 20,000,000 shares of Preferred Stock, also one cent ($.01) par value. In addition, the Debtor's Board of Directors designated 2,000,000 shares of Preferred Stock as Series A Preferred Stock and 3,410,000 shares of Preferred Stock as Series B Preferred Stock. As of the Petition Date, there were issued and outstanding: (i) 2,274,375 shares of Common Stock and (ii) 2,000,000 shares of Series A Preferred Stock and 3,404,254 shares of Series B Preferred Stock. In addition, the Debtor had outstanding, as of the Petition Date, options and warrants to acquire another 5,377,000 shares of its Common Stock. Pursuant to the

Convertible Subordinated Notes, the Debtor became obligated to issue additional warrants to purchase Common Stock. The Debtor did not issue such warrants and the noteholders did not seek to exercise any rights with respect to such additional warrants.

## G.     Officers and Directors

Karl Wassmann, a Managing Director of Valuation Perspective, Inc., was hired in April 2004 as the Debtor's Chief Restructuring Officer and William Tamul, a Vice President of Valuation Perspectives, Inc., was hired as the Debtor's Interim Controller. Danute Bankaitis-Davis, Ph.D., serves as a Company Vice President with primary responsibility for laboratory operations.

J. Terence Carleton (Chairman), Robert S. Attiyeh, Dr. Michael Bevilacqua and Joachim von Roy serve on the Debtor's Board of Directors.

## H.     Assets and Liabilities

As of the Petition Date, the Debtor's balance sheet reflects total assets with a book value of approximately $933,286, consisting primarily of accounts receivable and furniture, fixtures and equipment. In addition, the Debtor owned intellectual property of indeterminate value.

According to the Debtor's records, its liabilities as of the Petition Date totaled approximately $15,100,000, consisting of amounts owed to (i) holders of its Convertible Secured Notes, in the approximate sum of $2,788,450; (ii) holders of the Convertible Subordinated Notes in the approximate sum of $11,958,000; (iii) trade and other unsecured creditors holding undisputed claims in the aggregate amount of approximately $350,000.

For the fiscal year ended December 31, 2003, the Debtor suffered net operating losses of $3,501,610 on revenues of $2,370,867. For the twelve month period ending December 31, 2004, the Debtor's total revenues were $2.1 million and its net operating loss was $4.76 million.

For a further description of the Debtor's historical operations and financial results, reference should be made to Appendix C to this Disclosure Statement, which contains a summary of the Debtor's financial performance for the fiscal years 2001 through 2004.

## I.     Events Leading to the Debtor's Bankruptcy

### 1.     *Financial Performance*

Source's financial performance for the first quarter 2004 was a disappointment from both an operating and cash utilization perspective. Revenues in the first quarter were $372,900 whereas cash expenses were approximately $1,281,812 and the company ended the quarter with under $200,000 of unrestricted cash. This amount represents significantly less than one fifth of operating expenses.

The significant revenue shortfall in the quarter resulted from three factors: (1) revenues shifted out of the first quarter of 2004 and into the second quarter in the amount of $250,000–

$300,000 due to longer contract negotiations than expected; (2) Source lost certain contracts due to the merger of one of its customers; and (3) failure to obtain new orders as the company's sales team while concentrating on contract negotiations and not available to pursue new opportunities.

In addition, Source's financial problems have affected its ability to enter into strategic alliances with major pharmaceutical companies. The Debtor's current capital structure and severe undercapitalization is, not surprisingly, of significant concern to any potential alliance partner. Source believes that reorganization of its capital structure will enable it to create partnerships which will provide Source with long term revenue as opposed to short term individual projects.

## 2. *Problems with Current Capital Structure*

To date, Source has not had sufficient capital to pursue the commercial development of molecular diagnostic products. The structure of the Convertible Subordinated Notes has contributed significantly to Source's chronic undercapitalization. Specifically, Source is required to raise at least $10,000,000 to trigger the mandatory conversion provisions, which it has been unable to do despite having retained an investment banker to solicit a private placement. In addition, the Convertible Subordinated Notes do not have a floor conversion price. Furthermore, the Convertible Subordinated Notes cannot be modified without the consent of all of the holders. The Convertible Secured Notes will begin to come due in the summer of 2005 and the Debtor will not be able to repay the notes at that time.

## 3. *Source's Business Model*

Source's historic research and development ("R&D") services business model has not lived up to the Debtor's expectations. The expected returns from the R&D services business are insufficient to attract new capital and the sales cycle is very long and requires high level consultative selling by people with advanced science degrees. The company often spends considerable upfront unpaid consultative time in helping design the project studies. In addition, the FDA does not yet accept the use of gene expression of validation of pre-clinical and clinical drug discovery decision making. The approval process will take several years and there is no guarantee that the guidelines that the FDA ultimately issues will be favorable to the Debtor.

Project sales and pricing have also contributed to Source's economic woes. Initial project sales for pilot studies are often $50,000 or less and subsequent sales are delayed until the initial projects are completed and analyzed. In addition, and as noted above, the amount of time needed to complete each project is variable and beyond the control of the company. Pricing has been set with an expectation of 50% gross margins, but these margins have been insufficient to cover the cost of the long sales cycle and the working capital to run the business.

## J. **Pending or Contemplated Litigation**

The only adversary proceeding against the Debtor during the pendency of the case was resolved by settlement approved by the Court (D.I. 392). There remains no litigation pending by or against the Debtor in the bankruptcy case. The Debtor is presently investigating potential

patent infringement claims against certain third parties, but none have been brought at this time. It is possible that any such litigation will result in a material asset of the company, and the Debtor reserves all of its rights with respect to such litigation; however, it is impossible to accurately assess the value of any such case at this time. In addition, the Debtor contemplates possible bankruptcy litigation, including objections to claims and avoidance actions. The Debtor reserves all rights with respect to such claims and causes of action, whether prior to or subsequent to the filing of the Plan as set forth in Section 8.10 thereof, whether as an affirmative action or as a defense, setoff or counterclaim. If there exist facts or circumstances that would justify pursuit of any claim or cause of action against a third party, the Debtor reserves all rights to pursue such claims and causes of action, whether prior to or subsequent to the filing of the Plan.

## V.    THE CHAPTER 11 CASE

On May 25, 2004 (the "Petition Date"), the Debtor filed for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtor has continued to operate as a debtor-in-possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code.

An immediate effect of the filing of the Debtor's bankruptcy petition was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against the Debtor's property and the continuation of litigation against the Debtor. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a plan of reorganization.

Prior to the Petition Date, the Debtor had entered into a lease for approximately 32,000 square feet at a rental rate of over $54,000 per month. As of the Petition Date, about three years remained on the lease term. In December 2004, the Debtor rejected its original lease and entered into a new lease. The Debtor's new premises are comprised of approximately 11,000 square feet at a rental rate of about $7,500 per month, representing a savings of nearly $47,000 per month. The term of the new lease is one year, which will accommodate the Debtor's reorganization strategy without committing the Debtor to an overly burdensome administrative claim by its landlord.

Following the Petition Date, a dispute arose between the Debtor and Becton, Dickinson and Company ("BD"), under a research and development agreement between the parties. After extensive negotiations, the Debtor and BD entered into a Court-approved agreement, under the terms of which the Debtor granted BD exclusive licenses to certain intellectual property and BD made an initial payment to the Debtor, with further royalty payments to continue over time. The BD settlement provided an immediate cash infusion, and accommodated the Debtor's ability to maintain its postpetition operations while negotiating the terms of this consensual reorganization strategy.

## A.    Appointment of the Creditors' Committee

On June 8, 2004, the Office of the United States Trustee convened a meeting of creditors for the purpose of forming a committee of the Debtor's unsecured creditors. On that day, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee"). The Creditors' Committee is comprised of the following members:

> Earl Abramson
> 4300 W. 47th Street
> Chicago, IL 60632
>
> Dwight O. Badger
> Innovative Technology Partners, III
> 311 South Wacker Drive, Suite 1650
> Chicago, IL 60606
>
> Philip Evclides Theoharides
> 67 Warncke Road
> Wilton, CT 06897
>
> Maxwise Investment Limited
> 2nd Floor, LePrince de Galles
> 3-5 Avenue des Citronniers
> Monaco, MC 98000
>
> Brian Seed
> 9 Hawthorne Place, #5J
> Boston, MA 02114

The Creditors' Committee retained the law firm Young Conaway Stargatt and Taylor, LLP which retention was approved by the Bankruptcy Court on August 23, 2004. Subsequent to its appointment, two members of the Committee have resigned: Maxwise Investment Limited and Brian Seed. The United States Trustee has not replaced the resigning members, and the Committee is currently comprised of three members.

## B.    Debtor-In-Possession Financing And Cash Collateral

On the Petition Date, the Debtor filed a motion (the "DIP Motion") for authority to obtain a postpetition loan facility in the amount of up to $1,500,000 from Boulder Creek, and for authority to use cash collateral. As disclosed in the DIP Motion, the DIP Loan is derived from funds invested into the DIP Lender by several insiders (including present and former officers and directors and prepetition investors in the Debtor), including Richard Messina, J. Terence Carleton, Michael Bevilacqua and Joachim von Roy. The debtor has been informed that Carl Greer, a former director and equity holder, may acquire an interest in the DIP Loan proportionate to $400,000 of the DIP Loan contemporaneous with approval of the Plan. The Court granted interim approval of the DIP Loan on May 27, 2004, authorizing the Debtor to borrow up to

$300,000, and to use cash collateral pending a final hearing. On November 4, 2004, the Court entered an order authorizing the full amount of the DIP Loan and permitting the Debtor to enter into a Debtor-In-Possession Loan and Security Agreement dated as of June 23, 2004. By leave of the Court, the Debtor has sought and obtained various amendments to the DIP Loan, and the Debtor has been authorized to borrow up to $2,550,000 under the DIP Loan. The DIP Loan is secured by security interests in and liens upon all of the Debtor's assets (other than avoidance actions under Chapter 5 of the Bankruptcy Code), but is junior to (i) valid, perfected and non-avoidable liens and security interests held by holders of the Convertible Secured Note Claims (other than the Avoidable Convertible Secured Note Claims), (ii) quarterly fees of the United States Trustee, and (iii) up to $100,000 in Court approved fees and expenses of duly retained professionals accrued and unpaid prior to the Maturity Date and up to $50,000 in Court approved fees and expenses of duly retained professionals accrued after the Maturity Date. Pursuant to the DIP Loan, the DIP Loan bears interest at a fixed rate of ten percent (10%) per annum and matured on May 16, 2005 (the "Maturity Date"). The current outstanding balance under the DIP Loan is approximately $2,400,000, together with accrued interest in the amount of approximately $100,000. The Debtor forecasts that additional DIP financing may be necessary to sustain operations through confirmation of the Plan.

## C. Employee Retention Program

On the Petition Date, the Debtor filed a motion for authority to implement a employee retention program for its critical employees (the "Retention Motion"). The Retention Motion seeks to pay each employee a payment equal to between two and four months' salary (the "Retention Payment") which will be payable upon the earlier of (i) the effective date of a plan of reorganization or (i) the consummation of a sale (or merger) of substantially all of the Debtor's assets. The total cost of the employee retention program, in the event all eligible employees earn their full Retention Payment, was approximately $442,069, but has been reduced to $355,789 due to employee resignations.

## VI. SUMMARY OF THE REORGANIZATION PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN, WHICH ARE OR WILL HAVE BEEN FILED PRIOR TO THE HEARING ON APPROVAL OF THIS

DISCLOSURE STATEMENT, WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR, THE REORGANIZED DEBTOR, AND OTHER PARTIES IN INTEREST.

## A. Structure of the Plan, Valuation Methodology and Conditions Precedent

### 1. *Structure*

Under the Plan, Claims against, and equity Interests in, the Debtor are divided into five (5) Classes according to their relative priority and other criteria. If the Plan is confirmed by the Bankruptcy Court and consummated, (i) holders of DIP Loan Claims (with the exception of Claims on account of funds advanced under the DIP Loan on or after June 17, 2005) will receive shares of New Series A Preferred Stock which, in the aggregate, represent 25% of the ownership interest in the Reorganized Debtor, (ii) holders of Allowed Convertible Secured Note Claims and Avoidable Convertible Secured Note Claims will receive shares of New Series A Preferred Stock which, in the aggregate, represent 15% of the ownership interest in the Reorganized Debtor, (iii) holders of Allowed Convertible Subordinated Note Claims and general unsecured creditors will receive a Pro Rata beneficial interest in the Class 3 Trust, which shall hold shares of New Series A-1 Preferred Stock, which, in the aggregate, represent 10% of the ownership interest in the Reorganized Debtor. Holders of existing Preferred Stock and Common Stock will have their Interests extinguished under the plan. The Classes of Claims against, and Interests in, the Debtor created under the Plan, the treatment of those Classes under the Plan and the securities and other property to be distributed under the Plan are described below.

The Plan anticipates the conversion of Claims against the Debtor valued at an aggregate of approximately $17,203,007 into New Series A Preferred Stock, New Series A-1 Preferred Stock and New Common Stock in the Reorganized Debtor. The Plan also anticipates that as consideration for the Recapitalization Amount, the Investors will receive shares of New Series A Preferred Stock which, in the aggregate, represent at least a 40% ownership interest in the Reorganized Debtor. Finally, the Plan anticipates that the Debtor's current management and new management will receive options or warrants to purchase shares of New Common Stock, which, in the aggregate, represent a 10% ownership interest in the Reorganized Debtor, and, as part of that 10% ownership interest, Debtor's current interim management, Valuation Perspectives, Inc., subject to court approval, will receive warrants to purchase shares of New Common Stock, which, in the aggregate, represent a 4% ownership interest in the Reorganized Debtor. See also, Section VIII.C.2. for disclosures regarding equity interests to be vested in Valuation Perspectives, Inc. and the U.S. Trustee's position regarding the same.

The funds necessary to finance the Reorganized Debtor's payment obligations and working capital needs under the Plan (defined in the Plan as the "Recapitalization Amount") will be generated by the sale of New Series A Preferred Stock in the Reorganized Debtor. The Recapitalization Amount will be an amount equal to at least $5,000,000 but not to exceed $6,000,000.

## 2. *Conditions Precedent*

As discussed below, the Debtor will not consummate the Plan and it will not become effective unless the following conditions, among others as set forth more fully in Sections 11.1 and 11.2 of the Plan, are satisfied: (i) entry of the Confirmation Order; and (ii) the Debtor shall have received executed Stock Purchase Agreements, together with sufficient funds to satisfy the Recapitalization Amount.

## 3. *Business Plan and Projections*

The terms of the Plan are based upon, among other things, the Debtor's assessment of its ability to achieve the goals of its new business plan, make the distributions required under the Plan and repay its continuing obligations in a manner consistent with the working capital requirements of its restructured business. In conjunction with the Plan, the Debtor has prepared post-Effective Date financial projections of earnings and cash flows (see "Projections" annexed hereto as Appendix B.) For a description of the Debtor's post-confirmation business plan, see the section of this Disclosure Statement entitled "Provision for the Execution and Implementation of the Plan."

## B. Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code requires that a plan of reorganization classify the claims of a debtor's creditors and the interest of its equity holders. The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of reorganization may place a claim of a creditor or an interest of an equity holder in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Plan places into five separate Classes: (i) the Secured Claims of holders of the Convertible Secured Notes (other than Avoidable Convertible Secured Notes); (ii) the Unsecured Claims of the holders of the Avoidable Convertible Secured Notes; (iii) General Unsecured Claims, including the Unsecured Claims of the holders of the Convertible Subordinated Notes; (iv) preferred stockholder Interests; and (vi) common stockholder Interests.

The Debtor believes that it has classified all Claims and Interests in compliance with the requirements of section 1122 of the Bankruptcy Code. If a Creditor or Interest holder challenges such classification of Claims or Interests and the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor, to the extent permitted by the Bankruptcy Court, intends to make such reasonable modifications to classifications of Claims or Interests under the Plan to provide for whatever classification might be required by the Bankruptcy Court for confirmation. EXCEPT TO THE EXTENT THAT SUCH MODIFICATION OF CLASSIFICATION ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR INTEREST AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM OR INTEREST PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM OR INTEREST REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER IS ULTIMATELY DEEMED TO BE A MEMBER.

The Bankruptcy Code also requires that a plan of reorganization provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest. The Debtor believes that it has complied with such standard. If the Bankruptcy Court finds otherwise, it could deny confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

       1.    *Claims*

          a.    Class 1: Convertible Secured Note Claims

On the Effective Date, each holder of a Convertible Secured Note shall be deemed to hold an Allowed Class 1 Claim in the full amount of all principal and interest due under such Note (as determined as of the Effective Date) and all reasonable fees, costs and charges as may be approved by the Bankruptcy Court under section 506(b) of the Bankruptcy Code. In full satisfaction, settlement, release and discharge of and in exchange for each Allowed Class 1 Claim, the Reorganized Debtor shall issue to (i) the holders of such Claims and (ii) to the holders of Allowed Class 2 Claims, Pro Rata, shares of New Series A Preferred Stock, which, in the aggregate, represent 15% of the Fully Diluted Equity of the Reorganized Debtor.

Class 1 Claims are Impaired.

          b.    Class 2: Unsecured Avoidable Convertible Secured Note Claims

On the Effective Date, each holder of an Avoidable Convertible Secured Note shall be deemed to hold an Allowed Class 2 Claim in the full amount of all principal and interest due under such Note (as determined as of the Effective Date) and all reasonable fees, costs and charges as may be approved by the Bankruptcy Court under section 506(b) of the Bankruptcy Code. In full satisfaction, settlement, release and discharge of and in exchange for each Allowed Class 2 Claim, the Reorganized Debtor shall issue to (i) the holders of such Claims and (ii) to the holders of Allowed Class 1 Claims, Pro Rata, shares of New Series A Preferred Stock, which, in the aggregate, represent 15% of the Fully Diluted Equity of the Reorganized Debtor. For avoidance of doubt, from and after the Effective Date, the holders of Allowed Claims in Classes 1 and 2 shall own shares of New Series A Preferred Stock, which, in the aggregate, represent 15% of the Fully Diluted Equity of the Reorganized Debtor.

The Plan and Disclosure Statement are fully consensual creditors and the DIP Lender and are the result of extensive, arm's-length negotiations between representatives of the Debtor, the Secured Note Holders and the Committee. As an integral part of that compromise and to obtain the support of all parties for the terms of the Plan, it is agreed that the holders of the Avoidable Convertible Secured Note Claims would receive treatment equal to that of the holders of Class 1 Convertible Secured Note Claims.

Class 2 Claims are Impaired.

      c.      Class 3: General Unsecured Claims

From and after the Effective Date, and in full satisfaction, settlement, release and discharge of and in exchange for such Class 3 Claims, each holder of an Allowed Class 3 Claim will receive a Pro Rata beneficial interest in the Class 3 Trust.

On the Effective Date, the Reorganized Debtor shall issue to the Class 3 Trust shares of New Series A-1 Preferred Stock, which, in the aggregate, represent 10% of the Fully Diluted Equity of the Reorganized Debtor.

Subject to the limitations set forth in Section 5.3(d) of the Plan, each person who is an Accredited Class 3 Holder shall have the right, but not the obligation, to participate as an Investor by purchasing shares of the New Series A Preferred Stock, on the same terms and conditions as are agreed to by Investors who are not Accredited Class 3 Holders, by execution and delivery, on or prior to the Investor Subscription Deadline, of a Stock Purchase Agreement in the form attached to the Plan as Exhibit C (and as such agreement may be amended on terms satisfactory to Investors investing a majority of the Recapitalization Amount) and payment in full, on or prior to the Investor Subscription Deadline, of the purchase price of the New Series A Preferred Stock to be purchased, which shall be held in an escrow account established pursuant to an Escrow Agreement substantially in the form attached to the Plan as Exhibit D (and as such agreement may be amended on terms satisfactory to Investors investing a majority of the Recapitalization Amount).

The right to participate as an Investor set forth in Section 5.3(c) shall be subject to the following limitations (i) the Accredited Class 3 Holders, in the aggregate, may not purchase shares of New Series A Preferred Stock with an aggregate purchase price in excess of One Million Five Hundred Thousand Dollars ($1,500,000), (ii) subscription amounts for each Accredited Class 3 Holder exercising such right shall be not less than $250,000 (subject to clause (iv) below), (iii) subscription amounts in excess of $250,000 shall be in increments of $50,000 (subject to clause (iv) below), and (iv) in the event that Accredited Class 3 Holders in the aggregate seek to subscribe for shares of New Series A Preferred Stock having an aggregate purchase price in excess of $1,500,000, the subscription of each Accredited Class 3 Holder seeking to subscribe and satisfying the requirements of this Section 5.3 shall be reduced on a pro rata basis until the aggregate purchase price is equal to $1,500,000 or such amount as would result in the issuance of the nearest number of shares of New Series A Preferred stock that is a whole number to Accredited Class 3 Holders.

Class 3 Claims are Impaired.

      2.     *Interests*

      d.      Class 4: Preferred Stock Interests

Class 4 consists of all Preferred Stock Interests in the Debtor, including any and all issued and outstanding shares of the Debtor's Series A Preferred Stock (the "Preferred Stock"),

including options, warrants and other rights to acquire stock in the Debtor. On the Effective Date, Class 4 Preferred Stock Interests shall be extinguished under Plan.

Class 4 Preferred Stock Interests are Impaired.

e.     Class 5:  Common Stock Interests

Class 5 consists of all equity Interests in the Debtor, other than Class 4 Interests, including any and all issued and outstanding shares of the Debtor's common stock, and options, warrants and other rights to acquire such stock. On the Effective Date, Class 5 Common Stock Interests shall be extinguished under Plan.

Class 5 Common Stock Interests are Impaired.

## VII.    TREATMENT OF UNCLASSIFIED CLAIMS

### A.     Administrative Claims

Administrative Claims consist of the costs and expenses of administration of the Chapter 11 Case. They include, but are not limited to, the costs of operating the Debtor's business from and after the Petition Date and outstanding unpaid fees and expenses of the professionals as approved by the Bankruptcy Court.

On the Effective Date, or as soon thereafter as practicable, a holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim, or (b) such other treatment as to which the Debtor and such holder shall have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

With approval from the Court, the Debtor has engaged Gadsby Hannah LLP and Landis, Rath & Cobb LLP as its bankruptcy counsel. In addition, the Debtor has obtained Court approval to employ Bromberg & Sunstein LLP as its intellectual property counsel and Valuation Perspectives, Inc., as Interim Management. The Committee has employed the law firm of Young Conaway Stargatt & Taylor, LLP, as its counsel. Net of amounts previously paid as retainers (or carved out from the proceeds of the DIP Loan), and assuming the success fee that Valuation Perspectives, Inc. intends to seek is approved in the form of equity, the Debtor expects that approximately $1.6 million will be owed to professionals following the Allowance of such Administrative Claims. Principals of Valuation Perspectives, Inc. intend to become Investors in the amount of up to $500,000 in exchange for Series A Preferred Stock as part of the proposed Recapitalization (such sums to be derived from the anticipated allowance of Valuations Perspectives, Inc.'s allowed administrative claim).

All payments to professionals in connection with the Chapter 11 Case for compensation and reimbursement of expenses will be made in accordance with the procedures established by

the Bankruptcy Code and the Bankruptcy Rules and are subject to the approval of the Bankruptcy Court.

### B.    Priority Tax Claims

With respect to each Allowed Priority Tax Claim, at the sole option of Reorganized Debtor, the holder of an Allowed Priority Tax Claim shall be entitled to receive on account of such Allowed Priority Tax Claim, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim, (a) equal Cash payments made on the last Business Day of every three-month period following the Effective Date, over a period not exceeding six years after the assessment of the tax with interest from the Effective Date calculated at the rate available on ninety (90) day United States Treasury securities on the Effective Date, (b) such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the Debtor or the Reorganized Debtor, provided such treatment is on more favorable terms to the Debtor or Reorganized Debtor, as the case may be, than the treatment set forth in clause (a) hereof, or (c) payment in full; provided that, with respect to clause (b) hereof, such treatment is approved by the Bankruptcy Court; and provided further that any payments made to the holder of an Allowed Priority Tax Claim shall be applied first to the so-called "trust fund" portion of such claim for which any of the officers, directors, employees or agents of the Debtor or the Reorganized Debtor may be liable under applicable law.

### C.    DIP Loan Claim

The DIP Loan Claim in the amount of $2,300,000 became fully due and payable on May 16, 2005, pursuant to the DIP Loan. On the Effective Date, the DIP Loan Claim (with the exception of Claims on account of funds advanced under the DIP Loan on or after June 17, 2005) plus accrued interest of approximately $100,000 shall be converted into shares of New Series A Preferred Stock upon the same terms and conditions as are then being offered to the Investors which, in the aggregate, represent at a 25% ownership interest in the Reorganized Debtor. Notwithstanding any provision of the Plan to the contrary, Allowed Administrative Claims on account of funds advanced under the DIP Loan on or after June 17, 2005 shall be repaid in full in cash on the Effective Date, or upon such other terms as agreed to by the Debtor and the holder of such Claim.

## VIII.    PROVISIONS FOR THE EXECUTION AND IMPLEMENTATION OF THE PLAN

### A.    The Reorganized Debtor's Business Model

The Debtor's business plan has changed from its previous business model. The Debtor has adopted a revised business model for a variety of reasons, most importantly based on the conclusion that its R&D service business model does not produce enough revenue to support a viable business.

**Restart based on New Management and Science Team.**

Source Precision Medicine ("Source" or the "Company") is the first life science company to discover and reduce to practice a molecular diagnostic system to measure cellular gene expression with sufficient precision to track an individual's current health, disease status and individual response to drug therapy. Many leaders of the medical profession believe that medical practice will change dramatically when molecular diagnostic technology is applied routinely to patient care. Molecular diagnostics will play an important role in the practice of medicine, public health, pharmaceutical industry, forensics and biological warfare in the 21st century with rapid growth predicted from approximately $5.5 billion to over $35 billion over the next ten years. As illustrated in the chart below, molecular diagnostics is predicted to grow at a compound annual rate of over 20.3% to reach approximately 34% of the $103 billion *in vitro* diagnostics ("IVD") market by 2015. This predicted growth is based on the basic premise that molecular diagnostics will for the first time provide physicians with a precise means to monitor individual health and response to drug therapy in order to select the best medication and set the proper dosage and schedule.

| Worldwide *In Vitro* Diagnostics Market | | | | |
|---|---|---|---|---|
| *Amounts in billions* | | | | |
| | 2005 | 2010 | 2015 | 2005-2015 CAGR |
| *In Vitro* Diagnostics | $ 46.1 | $ 72.5 | $ 103.0 | 8.4% |
| Molecular Diagnostics | $ 5.5 | $ 12.0 | $ 35.0 | 20.3% |
| % of IVD market | 11.9% | 16.6% | 34.0% | NM |
| Source: Jain PharmaBiotech | | | | |

Since 1999, Source has raised approximately $25 million to build its scientific platform and drive the first phases of molecular diagnostics product development. Source's founding management team unfortunately has failed in the execution of its business and research plans to exploit its early science lead in this large and rapidly growing market in a number of key areas. Probably most damaging, Source has failed to publish any peer reviewed scientific papers or otherwise successfully promote its scientific achievements. Thus, Source's scientific discoveries and capabilities are largely unknown outside of its pharmaceutical client base. The combination of a weak management team, an unprofitable business plan, "unproven science" and a debt-laden capital structure has been detrimental to the Company's ability to raise capital from the venture capital community and the Company was forced to file for Chapter 11 bankruptcy protection in Delaware on May 25, 2004. During the last ten months under the interim management of Valuation Perspectives, Inc., the Company has been able to execute on many aspects of a new business strategy including executing a licensing agreement in the field of sepsis with Becton Dickinson and receiving notices of allowance on its Omnibus "Normals" patent. The Company has received positive responses from its customers and potential corporate partners for maintaining high quality R&D biomarker services throughout the bankruptcy period. The fundamental premise of this reorganization plan is a restart of the business with experienced business management and world-class scientific leadership and to execute a new business model to capitalize on its scientific lead in the large emerging markets for pharmaceutical biomarker products and molecular diagnostics products for patient care.

Source has pioneered technology—the subject of issued and pending patents—that has the potential of being a cornerstone of the future practice of medicine based on molecular diagnostics. Source has developed methods for measuring gene expression in ways that are significantly more accurate, reproducible, and consistent across panels of genes than were previously known or thought possible. Moreover, Source has discovered that these new methods reveal biological phenomena that were previously difficult or impossible to observe using traditional gene expression measurement techniques. Source's research has produced the discovery that there are normal levels of gene expression for various types of genes in a wide variety of circumstances, as well as characterized abnormal molecular patterns that define a variety of disease states. Source has discovered that gene expression levels must exist within tolerable limits in order for an individual to maintain normal health. Source's analysis of gene expression levels found in circulating blood cells collected from normal healthy donors demonstrate that gene expression is extremely consistent over time in an individual. Company research has also shown that such consistency and similarity in gene expression also exists within a population.

The term "molecular diagnostics," has been reserved for use with technology and techniques that identify and/or quantify genetic materials (DNA, RNA) and describes technology dealing with the over 30,000 genes in the human body and their expression and/or identifying presence in the determination of pathological states. Source is uniquely positioned to participate in the large growing market of molecular diagnostics. In the past few years, Federal funded research grants to academic research centers and researchers in pharmaceutical companies all over the world have discovered, primarily using microarray technology, a large number of single marker genes linked to specific diseases. Much of this science has been published in scientific journals. Source's molecular assays are more precise than microarray technology but also are unique in their ability to measure multiple genes in a calibrated fashion that becomes the foundation for the development of multi-gene algorithm based biomarkers. As researchers discover a torrent of single gene markers their next logical scientific step is to look for multiple gene disease interaction and Source has patented what we believe to be the only molecular assay system for precise analysis of gene expression for multiple genes. Source's technology provides a quantitative sensitivity and specificity to gene measurement that is protected by its patent portfolio.

Pharmaceutical companies have been the first to apply molecular diagnostic technologies for commercial purposes to improve the drug development process. The rising costs of drug development demand improved efficiency. Source's current molecular diagnostics products and services are being used by the pharmaceutical industry to make better and faster product drug development decisions both in the laboratory and in the clinic, thereby speeding the drug development process. The Company has undertaken approximately 80 client projects totaling in excess of $8.8 million in revenue for over 30 pharmaceutical and biotechnology companies, including repeat sales to leading companies and institutions including Pfizer, Eli Lilly, F. Hoffman LaRoche, Abbott Labs, Becton Dickinson, Amgen and the Lawrence Livermore National Laboratory. Source plans to expand its relationships with these companies based on biomarker development in the disease areas of inflammation, immune response and infectious disease.

26

Source has identified, analyzed and patented approximately 300 genes that form the basis for biomarker panels for diseases including rheumatoid arthritis, multiple sclerosis, lupus, transplant rejection, psoriasis and sepsis. Biomarker panels can be utilized throughout the research and development pipelines for a variety of applications. Some of the potential applications include patient stratification during clinical studies, early disease identification, identifying individuals who respond best to specific medicines, accelerating the "go-no go" decision process in clinical studies, strategic drug placement, target discovery, and identifying the "right" medicines for the right individuals. Biomarkers are also proving to have value pre-clinically as they can help determine drug efficacy in animal models and human trials. The earlier in the development process drug-related biomarkers can be applied in drug evaluation processes, the better the prediction of drug efficacy, toxicity and clinical trial enrollment. To date, the Source laboratory has processed more than 6,000 human whole blood samples and over 640,000 high precision gene expression measurements for its pharmaceutical clients based on quantitative real-time PCR (polymerase chain reaction, a technique for amplifying and measuring specific genes consisting of nucleic acid sequences from a biological blood or tissue sample).

Source has been working since 1999 to apply and patent its expert technical and conceptual understanding of molecular medicine across a broad range of disease areas. Source's first issued omnibus patent (6,692,916, issued February 17, 2004) covers precision and calibration in the process of preparing and measuring gene expression data. Entitled "System and Method for Characterizing a Biological Condition or Agent Using Calibrated Gene Expression Profiles", this patent provides Source an important foundation in the area of gene expression analysis. Precision and calibration in gene expression measurements allow improved comparisons of data across subjects and time, thereby enabling the construction of Source's molecular medicine knowledge base. Source's second omnibus patent application (entitled "Identification, Monitoring and Treatment of Disease and Characterization of Biological Condition Using Gene Expression Profiles") establishes the normal gene expression pattern in healthy subjects and has major implications for the practice of molecular medicine. Source has recently received two notices of allowability for this second omnibus patent for two sets of claims. Using our proprietary technology, Source has established a growing human database on gene expression for both normal individuals and patients across a broad range of disease states and other characteristics, including data relating to disease progression over time and patient responses to specific treatments.

The key goals for the restart of the Company include continuing to move the science forward through partnering with leading research academic centers and leading pharmaceutical companies and partnering with leading diagnostics companies for marketing the diagnostic products. Source needs to keep the cash burn rate relatively low until a turning point is reached clearly signaling growth in the pharmaceutical biomarker business. The immediate focus for Source's new management team will be on closing a strategic partnership with one of the leading pharmaceutical companies, although there can be no certainty that such a partnership can be consummated. In parallel, the Company will focus on licensing programs like the Becton Dickenson agreement around specific diseases with the leading diagnostics companies including Roche, Abbott, Genzyme, Johnson & Johnson, Beckman-Coulter, Bayer Diagnostic, Becton Dickenson and GE Healthcare.

Ultimately, we believe a profitable business model will involve the successful negotiation and implementation of many collaborative, royalty-bearing marketing agreements for molecular diagnostics patient care products in a wide range of disease areas. We believe the pharmaceutical biomarker business for drug development should be viewed as a foundation to the ultimate goal of utilizing molecular diagnostics for patient care. The pharmaceutical biomarker drug development business can provide many benefits to the Company, including near term cash flow while the Company is developing the molecular diagnostic patient care market. The five-year financial projections in Appendix B are based on the assumption that 2005 will be a transition year in which we will rebuild the scientific base of the Company, form the Company's first pharmaceutical biomarker partnerships and establish a reputation for scientific leadership in biomarkers and molecular medicine through the establishment of a world class Scientific Advisory Board and actively publishing scientific papers.

The central question for the Source business plan is how long it will take the pharmaceutical industry to recognize the value of Source's biomarker technology and adopt it as core to clinical trial activity. The Company needs to transition its pharmaceutical business to multi-year biomarker development contracts in which Source would receive more predictable and profitable revenue streams, as well as retain marketing rights for molecular diagnostics products derived from the pharmaceutical clinical trials, even if it means in some cases sharing royalties with the pharmaceutical company. Long-term acceptance by the pharmaceutical industry of molecular biomarker technology is partly gated by the FDA acceptance in clinical trials of what is termed "surrogate biomarker" data in place of traditional clinical endpoint data. The FDA has recently issued draft guidelines in the area of co-development of drugs and diagnostics using molecular biomarkers.

The formation of a Scientific Advisory Board by the Company is important primarily to give scientific and marketing direction to the patient care business. Very little market research has been done by Source regarding what are the best market segments to launch its initial molecular diagnostics products. The initial focus on inflammation, immune response and infectious disease was driven primarily by the science backgrounds of the Company's founders. Ultimately, the success of molecular diagnostics products will be driven by the acceptance by clinicians and by the availability of third-party medical reimbursement. Source needs to work with leading academic research clinicians on the Scientific Advisory Board to determine where the "medical crises" exist that can only be solved by new molecular diagnostic technology. Infectious disease has been the first area to date better addressed by the use of molecular diagnostics products as evidenced by the license agreement with Becton Dickinson. The Company believes that life threatening diseases will be the easiest areas to gain acceptance as opposed to more long-term chronic patient care. We plan as a first step to review the entire product development pipeline with the Scientific Advisory Board and change priorities based on their input. In particular, we plan to review the opportunities in areas of cardiovascular disease, cancer and women's health with the Scientific Advisory Board.

## B.    Operational Accomplishments while in Bankruptcy

The weaknesses described in the section above were identified during the course of the bankruptcy. On a very limited budget the Interim Management of Valuation Perspectives was

able to address many of these weaknesses during the bankruptcy period to improve the Company's prospects for both emerging from bankruptcy and as an on-going operation as follows:

1. Maintained high quality customer service and lab operations. Throughout the time the Company has been in bankruptcy, customer service levels and lab operations have been maintained at high standards. The Company has met all customer deadlines and has maintained quality control of operations.

2. Expansion of Normals database to meaningful size. The Company has increased its database of "normal" health gene expression analysis from a population of approximately 70 patients in May 2004 to over 270 patients by July 2004. This has been a significant milestone for the Company in terms of proof of concept of its science for customer, potential corporate partners and potential investors. The Company needs to expand the normals database to include more population diversity, as well as expand the number of genes tested.

3. Renewed RA, MS, Lupus and transplant rejection clinical studies. Source renewed its investment in its own clinical studies that had been on hold for over 12 months based on the company's financial difficulties. This decision was made based on the clear indications from both potential corporate partners and investors that a major factor in demonstrating the value of Source's technology was in being able to show disease-specific data.

4. Expansion of Patents. In November 2004 Source completed a "Unity of Invention" patent application based on Source's previous filing in Europe. Source anticipates that this patent application may result in over 10 additional divisional patents being awarded in Europe. Source is in the process of filing three additional divisional patents and expects the filings to be completed shortly. These patents are "Continuance in Progress" of Source's first issued patent (6,692,916, issued February 17, 2004) to be filed in both the US and Europe. These three divisional patent applications for disease specific patents in RA, MS and lupus are in preparation based on the clinical studies underway by Source. Notices of Allowance was issued by the Patent Office for two sets of claims for the Company's Omnibus two "Normals" patent described above.

5. Completed License Agreement with Becton Dickinson in the field of Sepsis. A lawsuit was filed by Becton, Dickinson and Company against the Company that alleged infringement of intellectual property rights in a patent filed by the Company in August 2004. We resolved the dispute with Becton Dickinson and put in place a multi-year, licensing program for the field of sepsis with upfront payment and royalties over the life of the Company's patents.

6. Continued discussions with potential corporate partners including a leading pharmaceutical company. Source has made continued progress in executing its plan of attracting potential development and marketing partners for its biomarker products despite the complications of being in bankruptcy.

7. <u>Award of NIH Grant in MS.</u> Source was awarded a $100,000 Phase 1 NIH grant in late 2004 under the SBIR program in the disease area of MS. This award recognizes the importance of Source's science by a peer review group of scientists in the development of biomarkers for MS.

8. <u>Cost reduction of lab operations.</u> – We have identified several key cost reduction steps which are being implemented to reduce the cost of lab operations substantially. Specifically the cost of chemical reagents, plates and lab consumables will be reduced by more than 50% based on the transition to next generation ABI 7900 lab equipment and certain changes in lab procedures.

9. <u>Reduction of cost of facilities rental.</u> Source has been able to reject its old lease at a cost of $54,000 per month and move to a new facility for a cost of approximately $7,500 per month for a three year savings in total of approximately $1.67 million.

10. <u>Monthly Cost Reduction.</u> The total cost reduction of the Company's operations, not including professional fees, has been reduced from approximately $440,000 per month in April 2004 to approximately $125,000 per month in May 2005 (in part based on a 30 hour work week).

11. <u>Good Lab Practices "GLP" Certification</u>. The Company continues to make good progress toward achieving GLP certification. An audit was conducted by one of Source's clients in late April 2004 pointing out areas of improvement in order to achieve GLP status. Source has been able to make continued progress to the satisfaction of its customers despite budget constraints. The key area that Source is now concentrating on is the validation and documentation of its laboratory software systems. Source has contracted for the license of WIMMER validation software based on the recommendation of its largest customer to perform the necessary testing and documentation processes.

## C.     Operation of Business/Retention of Management

### 1.     *Board of Directors*

On the Effective Date, the term of the current members of the Debtor's Board of Directors will expire. Prior to the Effective Date, the Investors shall select the Reorganized Debtor's Board of Directors. The Board of Directors will consist of up to five members, of whom two shall initially be J. Terence Carleton and Frank W. Haydu III. Directors of the Reorganized Debtor shall serve staggered two year terms. Any holder (with its affiliates) of 30% or more of the New Series A Preferred Stock issued and outstanding as of the Effective Date, or, in the event there is a Second Closing, as of the Second Closing Date, shall have the right to appoint one (1) director and the holders of New Series A Preferred Stock will vote as a separate class for the election of all other Directors. Compensation, if any, for members of the Reorganized Debtor's Board of Directors will be determined by the entire board in accordance with generally accepted standard for businesses of like size. Biographical information about Mr. Carleton, Mr. Haydu and the named officers is as set forth on <u>Appendix D</u>.

## 2. *Management and Operation*

On the Effective Date, the following Persons shall become officers of the Reorganized Debtor: Karl Wassmann (Chief Executive Officer), Danute Bankaitis-Davis, Ph.D. (Vice President, Customer Laboratory), David Trollinger (Director, Sales and Marketing), Jim Walter (Director, Sales and Marketing) and William Tamul (Controller). The terms of employment for each such officer shall be determined and approved by the Board of Directors of the Reorganized Debtor on the Effective Date or as soon thereafter as is practicable. The Debtor intends to file the forms of employment agreements with the Court on or before 10 days before the Confirmation Hearing, along with all other exhibits to the Plan.

The Debtor's corporate office is currently located in Boulder, Colorado, which, in addition, houses certain technical, administrative, accounting, sales and sales support functions. The Debtor's present management is comprised principally of scientists who run the daily laboratory operations but who do not have commercial experience in sales and marketing of diagnostic products. Source intends to add additional senior scientists with such diagnostic experience including a Chief Science Officer and a Scientific Advisory Board. The Reorganized Debtor will work directly with the Investors to recruit the new business management team, and, therefore, the new executives may not be in place until some time after confirmation of the Plan.

On the Effective Date, or as soon as practical thereafter, an equity incentive program for senior management of the Reorganized Debtor shall be established whereby New Common Stock and/or options or warrants to purchase New Common Stock, representing 10% of the Fully Diluted Equity of the Reorganized Debtor, shall be reserved for potential grants to members of senior management upon such terms and conditions as may be determined by the Board of Directors. Valuation Perspectives, Inc., in accordance with the terms of the order authorizing its retention, and subject to Court approval of an appropriate application, will receive warrants to purchase shares of New Common Stock, which, in the aggregate, represent a 4% ownership interest in the Reorganized Debtor. If the application of Valuation Perspectives, Inc., is approved by the Court, such warrants will come out of the 10% ownership interest described above. After the Effective Date, in order to provide appropriate incentives to members of senior management, the Reorganized Debtor may increase the size of the equity incentive program in accordance with the terms of the executed investment documents. Regardless of whether or not the Court approves the application of Valuation Perspectives, Inc. for a success fee in the form of equity, individuals from Valuation Perspectives, Inc. will be serving in management roles for the Reorganized Debtor and will be eligible to participate in the equity incentive program described above, subject to the discretion of the Board of Directors. The United States Trustee has advised the Debtor that she believes that any subsequent equity investment by Valuation Perspectives, Inc. or its principals in the Reorganized Debtor for the period of three years following the conclusion of the engagement of Valuation Perspectives, Inc. is impermissible and that the United States Trustee intends to object to such provision of the Plan at the time of confirmation, unless a mutually acceptable resolution is reached. In order to manage the Debtor in accordance with the proposed Plan, principals of Valuation Perspectives, Inc. intend to cease operations of that company and devote their business efforts to the management of the Reorganized Debtor. The Debtor believes it is in the best interests of the Debtor's creditors to proceed with confirmation of a Plan with the proposed management team incentivized as described in this

31

Disclosure Statement. Failure to approve the compensation package as proposed may affect the Debtor's ability to confirm and consummate the Plan and may have a material impact on the projections set forth herein and the Debtor's contemplated reorganization efforts.

### D.    Cancellation of Common and Preferred Stock

On the Effective Date, (a) the Common Stock, the Preferred Stock and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtor shall be cancelled, and (b) the obligations of and/or Claims against the Debtor under, relating or pertaining to any agreements, indentures or certificates or designations governing the Common Stock, the Preferred Stock and any other note, bond, indenture or other instrument or document evidencing or creating any indebtedness or obligation of the Debtor shall be released and discharged.

### E.    Issuance of New Series A Preferred Stock, New Series A-1 Preferred Stock and New Common Stock

On the Effective Date, the Reorganized Debtor will issue sufficient shares of New Series A Preferred Stock, New Series A-1 Preferred Stock and New Common Stock to satisfy its obligations under the Plan. Shares of New Series A Preferred Stock will be issued to holders of DIP Loan Claims, Allowed Class 1 and Class 2 Claims and to the Investors in accordance with the terms of this Plan. New Series A-1 Preferred Stock will be issued to holders of Allowed Class 3 Claims in accordance with the terms of this Plan. Options and warrants to purchase shares of New Common Stock will be issued to the Debtor's current management and interim management.

Based upon its projections, the Debtor anticipates that it will need at least $5,000,000 to satisfy all payments required to be made under the Plan and to leave the Reorganized Debtor with sufficient working capital. The Reorganized Debtor intends to issue an amount not less than $5,000,000 but not to exceed $6,000,000 of New Series A Preferred Stock to meet these funding requirements.

1.    *Cancellation of Common Stock and Preferred Stock.*

On the Effective Date, (a) the Common Stock Interests, the Preferred Stock Interests and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtor, including but not limited to Claims arising under or in connection with the Convertible Secured Notes, the Avoidable Convertible Secured Notes and the Convertible Subordinated Notes shall be cancelled, and (b) the obligations of, and/or Claims against, the Debtor under, relating or pertaining to any agreements, indentures or certificates or designations governing the Common Stock Interests, the Preferred Stock Interests and/or any other note, bond, indenture or other instrument or document evidencing or creating any indebtedness or obligation of Debtor shall be released and discharged.

2. *Recapitalization of the Debtor; Sale and Issuance of New Series A Preferred Stock and Issuance of New Common Stock.*

On the Effective Date, the Reorganized Debtor shall consummate the Recapitalization by issuing sufficient shares of New Series A Preferred Stock, New Series A-1 Preferred Stock and New Common Stock to satisfy its obligations under the Plan. Shares of New Series A Preferred Stock will be issued to holders of Allowed Class 1 Claims, Allowed Class 2 Claims, the DIP Lender and the Investors in consideration of and exchange for the Recapitalization Amount in accordance with the terms of this Plan. Pursuant to Paragraph 10 of the Court's Order dated June 29, 2004, authorizing and approving the DIP Loan, the DIP Lender shall have the right to designate the person or persons who shall be Investors (except for those Accredited Class 3 Holders who have met the requirements of Section 5.3 herein) in the Reorganized Debtor. If more than $5,000,000 but less than $6,000,000 of New Series A Preferred Stock is issued on the Effective Date, the DIP Lender, within 45 days following the Effective Date (the "Second Closing Date"), may designate new or existing Investors to purchase such remaining shares of Series A Preferred Stock up to the maximum Recapitalization Amount. On the Effective Date, and if necessary, the Second Closing Date, the Reorganized Debtor shall issue to the Investors which have executed a Stock Purchase Agreement and paid the requisite subscription amount shares of the New Series A Preferred Stock which, in the aggregate, represent 40% of the Fully Diluted Equity of the Reorganized Debtor. On the Effective Date, shares of New Series A-1 Preferred Stock will be issued to the Class 3 Trust in accordance with the terms of this Plan and the Class 3 Trust Agreement. On the Effective Date, or as soon as practical thereafter, an equity incentive program for senior management of the Reorganized Debtor shall be established whereby New Common Stock and/or options to purchase New Common Stock representing 10% of the Fully Diluted Equity of the Reorganized Debtor (less any warrants issued to current interim management, Valuation Perspectives, Inc.) which shall be reserved for potential grants to members of senior management upon such terms and conditions as may be determined by the Board of Directors.

3. *Execution and Return of Stock Purchase Agreement.*

To purchase New Series A Preferred Stock, the Investors (which includes Accredited Class 3 Holders which have satisfied the subscription requirements of Section 5.3 of the Plan) must execute a Stock Purchase Agreement and return it to Debtor's counsel with the Stock Purchase Amount on or before the Investor Stock Purchase Deadline; provided, however, if the Accredited Class 3 Holders do not subscribe for $1,500,000 as provided in Section 5.3 of the Plan, the DIP Lender may, prior to the Second Closing Date, designate new or existing Investors to purchase such remaining shares of Series A Preferred stock up to the maximum Recapitalization Amount; provided, further, that as of the Confirmation Date, subscriptions and related funds for at least $5,000,000 shall have been received. Such amounts shall be held in escrow pursuant to the terms and conditions of the Escrow Agreement attached to the Plan as Exhibit D and incorporated therein by reference.

4. *Establishment Of The Class 3 Trust*

On the Effective Date, the Class 3 Trust will be formed. The Class 3 Trustee shall serve as trustee of the Class 3 Trust. The Reorganized Debtor shall compensate the Class 3 Trustee for his administration of the Class 3 Trust at the rate of $10,000 per annum, which compensation shall be due and payable in advance on each anniversary of the Effective Date.

5. *Section 1145 Exemption*

As provided for in the Plan, and to the maximum extent provided by section 1145 of the Bankruptcy Code and applicable nonbankruptcy laws, the shares of the New Series A Preferred Stock and the New Common Stock issued pursuant to the Plan are exempt from registration under the Securities Act.

**F.     Post-Effective Date Operations of the Reorganized Debtor**

1. *Revesting of Assets*

On the Effective Date, and except as set forth in the Plan, all property of the Debtor's Estate shall revest in the Reorganized Debtor. Thereafter, the Reorganized Debtor may operate its business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court. On the Effective Date, all property of the Debtor's Estate shall be free and clear of all liens, Claims and Interests, except as specifically provided in the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay amounts that it incurs after the Effective Date for professional fees and expenses.

2. *Certificate of Incorporation and Bylaws*

The certificates or articles of incorporation and bylaws of the Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code.

3. *Operations of the Debtor Between the Confirmation Date and the Effective Date*

The Debtor will continue to operate as a debtor-in-possession, subject to the supervision of the Bankruptcy Court, under the Bankruptcy Code during the period from the Confirmation Date through the Effective Date. Any obligation incurred by the Debtor during that period for the purchase of inventory in the ordinary course of business will constitute an Administrative Claim and be treated accordingly. However, nothing in the Plan precludes the Debtor from taking any steps that it deems necessary or desirable to prepare for and consummate the Plan.

**G.     Dissolution of the Committee**

On the Effective Date, the Committee shall be deemed to have been dissolved by Final Order of the Court.

### H. Distributions Under the Plan

#### 1. *Allowance of Administrative Claims*

##### a. Professional Fees

All final requests for payment of Professional Fees must be filed no later than sixty (60) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Allowed Amounts of such Professional Fees shall be determined by the Bankruptcy Court.

##### b. Other Administrative Fees

All other requests for payment of an Administrative Claim must be filed with the Bankruptcy Court and served on counsel for the Debtor no later than 30 days after the Effective Date. Unless the Debtor objects to an Administrative Claim within thirty (30) days after receipt, or within such time as may be fixed by the Bankruptcy Court, such Administrative Claim shall be deemed Allowed in the amount requested. In the event that the Debtor objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed Amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim which is paid or payable by the Debtor or the Reorganized Debtor in the ordinary course of business.

#### 2. *Time of Distributions*

Except as otherwise provided for in the Plan or ordered by the Bankruptcy Court, distributions under the Plan shall be made on the Effective Date, or as soon thereafter as is practicable, to holders of all Allowed Claims and Allowed Interests entitled to receive a distribution under the Plan.

#### 3. *Delivery of Distributions*

Distributions to holders of Allowed Claims shall be made by the Reorganized Debtor at the addresses set forth on the proofs of claim filed by such holder or, if no proof of claim is filed or if the Debtor has been notified of a change of address, then (a) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtor after the date of any related proof of claim, (b) at the addresses reflected in the Schedules if no proof of claim has been filed and the Reorganized Debtor has not received a written notice of change of address, or (c) in the case of the holder of a Claim that is governed by an indenture or other agreement and is administered by an indenture trustee, agent or servicer, at the addresses contained in the official records of such indenture trustee, agent or servicer. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Reorganized Debtor is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest. Amounts in respect of undeliverable distributions made through the Reorganized Debtor shall be returned to the Reorganized Debtor until such distributions are claimed. All claims for undeliverable distributions shall be made on or before the first anniversary of the Effective Date. After such date, all unclaimed property shall

revert to Reorganized Debtor and the claim of any holder or successor to such holder with respect to such property shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary.

As of the close of business on the Distribution Record Date, the claims register shall be closed. The Reorganized Debtor shall have no obligation to recognize any transfer of any Claims occurring after the close of business on the Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under the Plan with only those holders of record as of the close of business on the Distribution Record Date.

The amount of any checks issued for distributions under the Plan that remain uncashed for a period of six months after the date of such distribution shall revert and be vested in the Reorganized Debtor free and clear of any claim or interest of any holder of a Claim under the Plan.

4.      *Form of Distributions.*

Any payment of Cash made by the Reorganized Debtor pursuant to the Plan shall be made by check; provided, however, that after the occurrence of the Effective Date, the Reorganized Debtor is not obligated to make any Cash payment under the Plan unless the payment exceeds ten dollars ($10); provided, further, that Cash equal to 100% of the distributions to which the holder of a Claim would be entitled under the Plan if the payment to such holder was less than or equal to ten dollars ($10) shall be maintained in a reserve (the "Small Payment Reserve") for the benefit of such holder until an aggregate of at least ten dollars is payable to such holder and at such time the holder shall receive a payment equal to 100% of the distributions to which it would otherwise be entitled.

5.      *Fractional Dollars.*

Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (rounding down in the case of $0.50 or less, and rounding up in the case of more than $0.50).

6.      *Procedures for Treating and Resolving Disputed and Contingent Claims*

a.      Objections to Claims

On the Effective Date, the sole and exclusive right to object to Disputed Claims or Interests shall vest in the Reorganized Debtor.

b.      No Distributions Pending Allowance

No payments or distributions will be made by the Reorganized Debtor with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order and the Disputed Claim has become an Allowed Claim. All objections to Claims must be filed on or before the Claims Objection Deadline.

## I.  Discharges, Releases and Settlements of Claims

### 1.  *Discharge of Debtor*

(a)     Except as provided section 524(e) of the Bankruptcy Code, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims of any nature whatsoever against: (i) the Debtor, (ii) any of the Debtor's assets or properties, and (iii) to the extent that such Claims derive from obligations of the Debtor, the Debtor's present officers and directors and employees.  Except as otherwise provided herein or in the Confirmation Order, and regardless of whether any money or property shall have been distributed or retained pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtor (and, to the extent noted above, its present Directors and employees) shall be deemed discharged and released under section 1141(d)(a)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Confirmation Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtor prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program regardless of whether such termination occurred prior to or after the Confirmation Date, and all debts of the kind specified in sections 502(g) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of claim based upon such debt is filed or deemed fined under section 501 of the Bankruptcy Code, (ii) the holder of a Claim based upon such debt accepted the Plan.  The Confirmation Order shall constitute the judicial determination or discharge of all liabilities of the Debtor, subject to the Effective Date occurring.

(b)     Except as otherwise specifically provided in this Plan or in section 524(e) of the Bankruptcy Code, the distributions and rights that are provided in this Plan shall be in complete satisfaction, discharge and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date) of (i) Claims and Causes of Action, whether known or unknown, against, liabilities of, liens on, obligations of and Interests in the Debtor or the Reorganized Debtor and (ii) all Causes of Action (whether known or unknown, either directly or derivatively through the Debtor or the Reorganized Debtor) against, claims against, liabilities of, liens on the direct or indirect assets and properties of, and obligations of the Debtor or the Reorganized Debtor and their successors and assigns, based on any act of omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim or Interest, in each case regardless of whether a proof of Claim or Interest was filed, whether or not Allowed and whether or not the holder of the Claim or Interest has voted on the Plan.

### 2.  *Compromises and Settlements*

Pursuant to Bankruptcy Rule 9019(a), the Debtor may compromise and settle various Claims against the Debtor and that the Debtor has or may have against other Persons.  The Debtor expressly reserves the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle Claims that they may have against

other Persons up to and including the Effective Date. After the Effective Date, such right shall pass to the Reorganized Debtor.

### 3. *Setoffs*

The Debtor may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtor may have against the holder of such Claim; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such claim that the Debtor may have against such holder.

### 4. *Exculpation and Limitation of Liability*

Except as otherwise specifically provided in the Plan, the Debtor, the Reorganized Debtor, Boulder Creek, the Committee and any and all of their present or former members, officers, directors, shareholders, employees, advisors, attorneys, accountants, representatives, financial advisors, investment bankers or agents and any and all of their successors, assigns and affiliates, shall not have or incur, and shall be held harmless and released from, any and all claims, obligations, Cause of Actions or liabilities to one another or to any holder of a Claim or an Interest or any other party in interest, or any of their respective agents, employees, shareholders, members, general partners, limited partners, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

### 5. *Injunction*

The satisfaction, release and discharge pursuant to the Plan shall also act as an injunction against any Person commencing or continuing any action, employment of process or act to collect, offset or recover any Claim or Cause of Action from or against the Debtor (and, to the extent that such Claim or Cause of Action derives from obligations of the Debtor, the Debtor's present Directors and employees) or the Reorganized Debtor to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

## J. **Executory Contracts and Unexpired Leases**

### 1. *Provisionally Assumed Contracts and Leases*

All executory contracts and unexpired leases specifically listed on the schedule of provisionally assumed executory contracts and unexpired leases annexed to the Plan as Exhibit E shall be deemed conditionally assumed as of the Effective Date subject to the provisions of Section 7.3 of the Plan. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such conditional assumptions pursuant to section 365 of the Bankruptcy Code,

effective as of the Effective Date. The Debtor reserves the right to file a motion on or before the Confirmation Date to assume an executory contract or unexpired lease that (a) is not listed on Exhibit E to the Plan, or (b) has not been previously assumed or rejected by a Final Order of the Bankruptcy Court. The Debtor reserves the right to amend Exhibit E to the Plan at any time on or before the Confirmation Date.

> 2. *Rejected Contracts and Leases*

Each executory contract and unexpired lease to which the Debtor is a party shall be deemed automatically rejected as of the Effective Date unless such executory contract or unexpired lease (i) shall have been previously assumed by the Debtor, (ii) is the subject of a motion to assume (and/or assume and assign) filed on or before the Confirmation Date, or (iii) is listed on the schedule of provisionally assumed contracts and leases attached to the Plan as Exhibit E. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code.

> 3. *Payments Relating to Assumption of Executory Contracts and Unexpired Leases*

Any monetary amounts by which each executory contract and unexpired lease to be assumed under the Plan may be in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, at the option of Debtor, Reorganized Debtor or the assignee of Debtor assuming such contract or lease, by Cure. Exhibit E contains a proposed cure amount for each of the provisionally assumed contracts and leases. Any interested party objecting to the assumption of any executory contact or lease or to the validity of the cure amount listed on Exhibit E or otherwise asserting that any amounts, defaults, conditions or pecuniary losses must be cured or satisfied under any executory contactor or lease as of the Petition Date (including accrued but not yet due obligations), in order for such contract to be assumed, must file and serve an objection on or before the Voting Deadline setting forth with specificity any and all cure obligations or conditions which such party asserts must be cured or satisfied with respect to such executory contract or lease. Each cure objection must set forth the cure obligation that the objector asserts is due, the specific types and dates of the alleged defaults, pecuniary losses and conditions to assignment, and the support therefor and all other objections to assumption. Any non-debtor party, alleged beneficiary of, and their respective successors and assigns, to any provisionally assumed executory contract or unexpired lease who fails to timely object to (i) a proposed cure amount shall be bound by such cure amount and such cure amount shall be deemed as the final Cure amount for such contract or lease, and (ii) assumption of such contract or lease shall forever be barred from asserting such objection in any case, proceeding or action, in law or equity, against the Debtor or the Reorganized Debtor, and any claims or actions related to any alleged breach, defaults or losses in connection with such assumption shall be forever barred, terminated and extinguished. In the event of a dispute regarding (a) the nature or the amount of any Cure, or (b) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, the Bankruptcy Court shall resolve such disputes. Cure shall occur following the entry of a Final Order resolving the dispute. Notwithstanding the foregoing, to the extent that there are disputes with respect to proper Cure amounts, the Debtor or

Reorganized Debtor shall place in a segregated account any undisputed amount and shall attempt within 45 days after the Effective Date to resolve such disputes. If such disputes are not resolved within such 45-day period, the Reorganized Debtor shall serve notice of a hearing to resolve disputed Cure amounts at which hearing the Bankruptcy Court shall adjudicate any and all outstanding Cure amount disputes. In the event the Court determines the appropriate Cure to be in an amount different than the amount alleged by the Debtor or Reorganized Debtor, the Reorganized Debtor may, in its sole discretion, elect to reject the applicable executory contract or unexpired lease with such rejection effective as of the Effective Date and in such case the executory contract or unexpired lease shall never have been deemed to have been assumed by the Debtor or the Reorganized Debtor. In cases where the Reorganized Debtor determines it will assume an executory contract or unexpired lease for which the Court has determined the Cure, the Reorganized Debtor shall pay such Cure amounts as soon as practicable after entry by the Bankruptcy Court of a Final Order of the appropriate Cure amount and such lease shall be deemed assumed. To the extent of no dispute concerning the amount of any cure or the underlying issue of adequate assurance of future performance or any other issue, such leases listed on Exhibit E to the Plan shall be deemed automatically assumed as of the Effective Date.

4.    *Rejection Damages Bar Date*

If the rejection of an executory contract or unexpired lease by the Debtor pursuant to the Plan results in damages to another party or parties to such contract or lease, a Claim for rejection damages, unless evidenced by an existing proof of claim, must be filed within 30 days after service of the first of (i) the Confirmation Order, or (ii) other notice indicating that the executory contract or unexpired lease has been rejected. If a timely proof of claim is not filed, the Claim for rejection damages will be forever barred and not enforceable against the Debtor or the Reorganized Debtor.

## K.    **Preservation of Causes of Action**

In accordance with section 1123(b)(3) of the Bankruptcy Code, and except as otherwise set forth below and as provided in the Plan, the Reorganized Debtor shall retain and may enforce all claims, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which the Debtor may hold against any entity, including, without limitation, any causes of action brought prior to the Petition Date, actions against any Persons for failure to pay for products or services rendered by the Debtor, all claims, causes of action, suits and proceedings relating to strict enforcement of the Debtor's intellectual property rights, including patents, copyrights and trademarks and all causes of action which may exist under sections 510, 542, 544 through 550, and 553 of the Bankruptcy Code or under similar state laws, including, without limitation, fraudulent conveyance claims, if any, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code. The Reorganized Debtor, in the exercise of its business judgment, will determine whether to enforce such rights. The Reorganized Debtor or any successors may pursue such litigation claims in accordance with the best interest of the Reorganized Debtor, its successors or assigns.

## IX.    CERTAIN FACTORS TO BE CONSIDERED

The holder of a Claim against or Interest in the Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein) before deciding whether to vote to accept or to reject the Plan.

### A.    General Considerations

The formulation of a reorganization plan is the principal purpose of a Chapter 11 case. The Plan sets forth the means for satisfying the holders of Claims against, or Interests in, the Debtor. Reorganization of the Debtor's business under the proposed Plan avoids the potentially adverse impact of a liquidation on the Debtor's employees, and many of its customers, trade vendors, suppliers of goods and services and lessors.

### B.    Conditions Precedent

As set forth in Sections 11.1 and 11.2 of the Plan, the following conditions must be satisfied prior to the Plan becoming effective:

*Conditions to Confirmation.* The following are conditions precedent to confirmation of the Plan :

      (a)    The Bankruptcy Court shall have entered an Order approving a disclosure statement with respect to the Plan in form and substance reasonably acceptable to the Debtor, Boulder Creek and the Committee;

      (b)    All Plan documents and all pleadings and orders shall be in form and substance satisfactory to the Debtor, Boulder Creek and the Committee.

      (c)    All investment documents shall be in form and substance satisfactory to the Debtor, Boulder Creek and the Committee.

      (d)    The Bankruptcy Court shall have entered the Confirmation Order.

*Conditions to the Effective Date.* The following are conditions precedent to the Effective Date of the Plan:

      (a)    Entry of the Confirmation Order, which order shall have become a Final Order; and

      (b)    Debtor shall have received executed Stock Purchase Agreements, together with sufficient funds to satisfy the Recapitalization Amount.

      (c)    All actions, other documents and agreements necessary to implement the Plan shall have been executed, delivered and, if necessary, properly recorded, and shall have become effective;

(d)     Two Million Five Hundred Thousand Dollars ($2,500,000) of the Recapitalization Amount will be available for working capital purposes after taking into consideration the initial payments to be provided for under the provisions of the Plan.

## C.     Inherent Uncertainty of Financial Projections

The Projections set forth in <u>Appendix B</u> are based on numerous assumptions that are an integral part of the Projections, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtor, industry performance, general business and economic conditions and other matters, many of which are beyond the Debtor's control and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement was approved by the Bankruptcy Court may affect the actual financial results of the Debtor's and the Reorganized Debtor's operations. Because the actual results achieved throughout the periods covered by the Projections may vary from the projected results, the Projections should not be relied upon as a guaranty, representation or other assurance of the actual results that will occur.

Additionally, the Debtor is at a relatively early stage in its development. The Debtor offers certain services and products available for sale with other products in various stages of the research and development process. Accordingly, the Debtor is subject to all of the risks and rewards inherent in such a business enterprise. The information contained herein reflects, among other things, the Debtor's best attempt to describe its future business prospects. However, there can be no assurance that such information will ultimately accurately reflect the level of economic success the business will reach in the future and such information should not be relied upon as a guaranty, representation or other assurance of such success.

## D.     Insider Transactions

Certain insiders of the Debtor are directly or indirectly holders of claims and interests in the Debtor. In particular, investors in the DIP Lender include certain insiders of the Debtor as disclosed in Section V.B. Additional insider claims or interests are listed on the attached Appendix F. A complete list of payments made to insiders within the one year period before the Petition Date is included in the Debtor's Statement of Financial Affairs.

## X.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a general summary of certain material federal income tax consequences of the Plan and the distributions provided thereunder for the Debtor's creditors and its shareholders. This summary does not discuss all aspects of federal income taxation that may be relevant to a particular creditor or shareholder in light of its individual investment circumstances or to certain creditors or shareholders subject to special treatment under the federal income tax laws (for example, tax-exempt organizations, foreign corporations or individuals who are not citizens or residents of the United States). This summary also does not discuss any aspects of state, local or foreign taxation.

This summary is based upon the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury regulations (including temporary regulations) promulgated thereunder, judicial authorities and current administrative rulings, all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision. Moreover, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. The Debtor has not requested a ruling from the Internal Revenue Service with respect to these matters and no opinion of counsel has been sought or obtained by the Debtor with respect thereto. FOR THE FOREGOING REASONS, CREDITORS AND SHAREHOLDERS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE AND LOCAL) TO THEM OF THE PLAN. THE DEBTOR IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR OR SHAREHOLDER, NOR IS THE DEBTOR RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

## A.    Federal Income Tax Consequences to the Debtor

### 1.    *Cancellation of Indebtedness*

Under general tax principles, the Debtor would realize cancellation of debt ("COD") income to the extent that the Debtor pays a creditor pursuant to the Plan an amount of consideration in respect of a Claim against the Debtor that is worth less than the amount of such Claim. For this purpose, the amount of consideration paid to a creditor generally would equal the amount of cash or the fair market value of property paid to such creditor. Because the Debtor will be in a bankruptcy case at the time the COD income is realized, under section 108 of the IRC, the Debtor will not be required to include COD income in gross income, but rather will be required to reduce tax attributes by the amount of COD income so excluded.

### 2.    *Limitation on Net Operating Losses*

The Debtor will experience an "ownership change" (within the meaning of IRC section 382) on the Effective Date as a result of the cancellation of the Old Common Stock and the issuance of New Common Stock in exchange for debt provided in connection with the Recapitalization. In connection with the Debtor's ownership change, the Reorganized Debtor's ability to utilize pre-Effective Date tax attributes to offset its income in any post-Effective Date taxable year (and in the portion of the taxable year of the ownership change following the Effective Date) will be subject to limitation by IRC sections 382, 383 and 269. Section 382 of the IRC generally provides for limitations on NOL's and built-in losses in connection with an ownership change, subject to certain exceptions for corporations reorganized in bankruptcy proceedings under title 11 or similar cases. Section 383 of the IRC provides further limitations on credits after the application of IRC section 382. In addition, IRC section 269 disallows certain deductions, credits or other allowances if a corporation is acquired for the principal purpose of the evasion or avoidance of Federal income tax. If the foregoing provisions do not preclude utilization of the tax attributes referred to above, a further change of ownership within

two years of the Effective Date or the failure of the Reorganized Debtor to continue its business could effectively eliminate those tax attributes remaining at that time.

## B. Federal Income Tax Consequences to Holders of Claims

The federal income tax consequences of the implementation of the Plan to a creditor will depend upon a number of factors, including whether the creditor is deemed to have participated in an exchange for federal income tax purposes, and, if so, whether such exchange transaction constitutes a tax-free recapitalization or a taxable transaction; whether the creditor's present debt Claim constitutes a "security" for federal income tax purposes; the type of consideration received by the creditor in exchange for his or her Allowed Claim; and whether the creditor reports income on the accrual basis.

A holder whose Claim is paid in full or otherwise discharged on the Effective Date will recognize gain or loss for federal income tax purposes equal to the difference between any such payment and the holder's adjusted tax basis in the Claim.

## C. Federal Income Tax Consequences to Holders of Common Stock Interests

Holders of Series A Preferred Stock and Common Stock Interests will not receive any distribution or property under the Plan, and will not retain such Interests. Each such holder will recognize a loss in an amount equal to such holder's adjusted tax basis, if any, in his or her Series A Preferred Stock or Common Stock Interests.

## XI. FEASIBILITY OF THE PLAN AND THE BEST INTERESTS OF CREDITORS

### A. Feasibility of the Plan

In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtor.

To support its belief in the feasibility of the Plan, the Debtor has prepared financial Projections as set forth in Appendix B annexed to this Disclosure Statement. The Projections reflect the Debtor's belief that the operational and financial changes contemplated by the Plan will restore it to sound financial health. The Debtor believes that, with the Recapitalization Amount, it will be able to focus its financial and managerial resources on business operations.

The Projections indicate that the Reorganized Debtor should have sufficient cash flow to repay and service its debt obligations and to maintain its operations following Confirmation. Accordingly, the Debtor believes that the Plan complies with the feasibility standard of section 1129(a)(11) of the Bankruptcy Code. As noted in the Projections, however, the Debtor cautions that no representations can be made as to the accuracy of the Projections or as to the Reorganized Debtor's ability to achieve the projected results. Many of the assumptions upon which the Projections are based are subject to uncertainties outside the Debtor's control. Some assumptions inevitably will not materialize and events and circumstances occurring after the date

on which the Projections were prepared may be different from those assumed or may be unanticipated, and may adversely affect the Debtor's financial results. Therefore, the actual results may vary from the projected results and the variations may be material and adverse.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY THE DEBTOR'S INDEPENDENT ACCOUNTANTS, ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH HAVE NOT BEEN ACHIEVED TO DATE AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTOR, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

## B.    Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims or Interests vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims or interests as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims or interests in that class, but for that purpose counts only those who actually vote to accept or reject the Plan. Thus a Class will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance. Holders of claims or interests who fail to vote are not counted as either accepting or rejecting the Plan.

## C.    Best Interests of Holders of Claims

As noted above, even if a plan is accepted by each class of holders of claims, the Bankruptcy Code requires that a bankruptcy court determine that the plan is in the best interest of all holders of claims that are impaired by the plan and that have not accepted the plan. The "best interests" test, as articulated in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 Case

were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced first, by the claims of secured creditors to the extent of the value of their collateral, and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both a Chapter 7 case and the Chapter 11 Case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtor in the Chapter 11 Case (such as compensation of attorneys, financial advisors and accountants) that are allowed in a Chapter 7 case, litigation costs, and claims arising from the operations of the Debtor during the pendency of the Chapter 11 Case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general claims or to make any distribution in respect of equity interests. The liquidation would also prompt the rejection of a number of executory contracts and unexpired leases and thereby increase the total dollar amount of General Unsecured Claims.

Once the Court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors under the Plan, then the Plan is not in the best interests of creditors.

As further discussed below, the Debtor believes that the members of each Class of Impaired Claims will receive at least as much under the Plan as they would receive if the Debtor were liquidated in Chapter 7.

### D. Liquidation Analysis

The Debtor believes that the Plan meets the "best interest of creditors" test of section 1129(a)(7) of the Bankruptcy Code because the members of each Impaired Class will either (i) accept the Plan or (ii) receive at least as much under the Plan as they would in a liquidation. Under the Plan, each creditor will convert its Claim into New Common Stock. In March 2003, the Debtor engaged the firm of Valuation Perspectives, Inc., to explore the possible sale of the Debtor's business as a going concern. After approximately one year of extensive analysis and marketing, Valuation Perspectives, Inc., was unable to identify a single strategic or financial buyer for the Debtor's business. In light of this recent and extensive marketing effort, the Debtor believes that Common Stock holders would receive no value from their Interests if the Debtor were liquidated in Chapter 7. Secured Claims asserted against the Debtor exceed $5.3 million. Administrative Claims will likely total more than $1.6 million. Were the Debtor to be liquidated under Chapter 7 of the Bankruptcy Code, it is highly unlikely that proceeds could be generated to pay Secured Claims in full, much less provide for the payment on account of Administrative Claims or provide any distribution to unsecured creditors. Attached hereto as Appendix E is an estimated liquidation analysis setting forth such calculation. It is the Debtor's opinion, therefore,

that the reorganization proposed by the Plan represents a much more favorable outcome for all creditors than any available alternative.

Despite substantial efforts to raise capital from investors outside of the existing DIP Lender and existing creditors, the Company has been unable to get any binding commitment for an investment in the Company as part of a reorganization. From the petition date of May 25, 2004 to the present, the Company has contacted and sent information memorandum regarding an investment in Source to over one hundred and fifteen (115) venture capitalists and approximately fourteen (14) potential corporate investors that are known to invest in development stage life science companies. The Company was able to set up over thirty (30) meetings from this list of contacts to make presentations regarding the Source technology and business opportunity. Approximately fourteen of these initial presentations were followed up by multiple meetings. All of the venture capital contacts declined to invest but a total of three (3) venture-backed companies and one (1) company funded by angel investors began due diligence including detailed review of the Company's intellectual property and reference checks with the Company's pharmaceutical clients. None of these due diligence efforts has resulted in an investment commitment.

The Company did receive a "Non-binding Outline of Possible Terms" for the purchase of substantially all of the assets of the Company from MetriGenix dated February 16, 2005 (the "MetriGenix Offer"). On that same day the Source Board of Directors approved the MetriGenix Offer, subject to the review of a final Definitive Agreement. Under the terms of the MetriGenix Offer, MetriGenix was to complete due diligence by March 4, 2005, deliver to the Company a Definitive Purchase Agreement by March 11, 2005 and the closing was to take place by April 8, 2005. During the course of the due diligence, MetriGenix's financial condition deteriorated and MetriGenix fell into default under the terms of the MetriGenix Offer regarding maintaining minimum cash balances. The Company never did receive a Definitive Purchase Agreement from MetriGenix and the MetriGenix Offer expired.

For all of the foregoing reasons, the Debtor believes and, therefore, submits that liquidation under Chapter 7 of the Bankruptcy Code would not generate any dividend to unsecured creditors and that the Plan represents a favorable outcome to such creditors.

### E.   Confirmation Without Acceptance Of An Impaired Class: The "Cramdown" Alternative

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of Claims has accepted it. The Bankruptcy Court may confirm the Plan at the request of the Debtor if the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the Plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (a)(i) that the holders of claims included in the rejecting class retain the liens securing those claims whether the property subject to those liens is retained by the debtor or

transferred to another entity, to the extent of the allowed amount of such claims and (ii) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the Allowed Amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (a) or (b) of this subparagraph; or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that the holder of any interest that is junior to the interest of such class will not receive or retain under the plan on account of such junior interest any property at all.

## F.    Conditions to Confirmation

### 1.    *Conditions to Confirmation*

The following are conditions precedent to confirmation of the Plan:

(A)    The Bankruptcy Court shall have entered an Order approving a disclosure statement with respect to the Plan in form and substance reasonably acceptable to the Debtor, Boulder Creek and the Committee;

(B)    All Plan documents and all pleadings and orders shall be in form and substance satisfactory to the Debtor, Boulder Creek and the Committee.

(C)    All investment documents shall be in form and substance satisfactory to the Debtor, Boulder Creek and the Committee.

(D)    The Bankruptcy Court shall have entered the Confirmation Order.

2.    *The Effective Date of the Plan*

The Effective Date shall occur upon the later of (a) the eleventh (11th) day following the entry of an Order confirming the Plan, or (b) the satisfaction or waiver of all conditions to the Effective Date set forth in Article 11 of the Plan.

## G.    Retention of Jurisdiction

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, but subject to any applicable Delaware Local Rule, and as more particularly described in Article 12 of the Plan, the Bankruptcy Court shall retain jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan, including, among other things, (a) the assumption or rejection of executory contracts or unexpired leases and the amount of any damages or Cure payments with respect thereto; (b) to determine any and all pending adversary proceedings, applications and contested matters; (c) to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan; (d) to hear and determine any and all objections to the allowance or estimation of Claims filed; (e) to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified or vacated; (f) to hear and determine disputes arising under, and issue orders in aid of, execution, implementation or consummation of the Plan; (g) to consider any modifications of the Plan; to hear and determine all applications for compensation and reimbursement of Professional Fees; (h) to recover all assets of the Debtor and property of its Estate; (i) to hear and determine matters concerning state, local and federal taxes; (j) to hear and determine all disputes involving the existence, nature or scope of the Debtor's discharge; and (k) to enter a final decree closing the Chapter 11 Case.

All parties in interest that are and shall be subject to the exclusive jurisdiction of the Bankruptcy Court in accordance with Article 12 of the Plan shall, under the Confirmation Order, be permanently enjoined from bringing any controversy subject to such exclusive jurisdiction of the Bankruptcy Court before or in any other forum, including, but limited to, any state or federal court.

## XII.    ALTERNATIVES TO THE PLAN

The Debtor believes that the Plan affords holders of Claims and holders of Interests the potential for the greatest realization on the Debtor's assets and, therefore, is in the best interests of such holders.

If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the pending Chapter 11 Case; (b) an alternative plan or plans of reorganization; or (c) liquidation of the Debtor under Chapter 7 or Chapter 11 of the Bankruptcy Code.

## A.    Continuation of the Chapter 11 Case

If it remains in Chapter 11, the Debtor could continue to operate its business and manage its properties as debtor-in-possession, but would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Debtor could survive as a going concern in a protracted Chapter 11 case. The Debtor could have difficulty sustaining the high costs, including

professional fees, if the Debtor remained a Chapter 11 debtor in reorganization. Ultimately, the Debtor (or other parties in interest) could propose another plan or liquidate under Chapter 7.

## B.    Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtor, or, if the Bankruptcy Court did not grant further extensions of the Debtor's exclusive period in which to solicit a reorganization plan, any other party in interest in the Chapter 11 Case, could propose a different plan or plans. Such plans might involve either a reorganization and continuation of the Debtor's business, an orderly liquidation of its assets, or possibly some elements of both.

## C.    Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtor's Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code. In a Chapter 7 case, a trustee or trustees would be appointed to liquidate the Debtor's assets. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtor.

The Debtor believes that in liquidation under Chapter 7, before creditors receive any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the estate. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of the Debtor's operations and the failure to realize the greater going concern value of the Debtor's assets.

The Debtor might also be liquidated pursuant to the provisions of a Chapter 11 plan. In a liquidation under Chapter 11, the Debtor's assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7. Thus, Chapter 11 liquidation might result in larger recoveries than in a Chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a Chapter 11 case, expenses for professional fees could be lower than in a Chapter 7 case, in which a trustee must be appointed. Any distribution to the holders of Claims under a Chapter 11 liquidation plan probably would be delayed substantially.

The likely form of any liquidation would be the sale of the Debtor's intellectual property. Based on this analysis, it is likely that a liquidation of the Debtor's assets would produce less value for distribution to creditors than that recoverable in each instance under the Plan. In the Debtor's opinion, the recoveries projected to be available in liquidation are not likely to afford holders of Claims and Interests as great a realization potential as does the Plan.

## XIII.  VOTING REQUIREMENTS

On _____, 2005, the Bankruptcy Court entered an order approving this Disclosure Statement, setting voting procedures and scheduling the hearing on confirmation of

the Plan. A copy of the notice of the Confirmation Hearing is enclosed with this Disclosure Statement. The Notice of the Confirmation Hearing sets forth in detail, among other things, the voting deadlines and objection deadlines. The Notice of Confirmation Hearing and the instructions attached to the Ballot should be read in connection with this section of this Disclosure Statement.

If you have any questions about the procedure for voting your Claim or Interest or with respect to the packet of materials that you have received or about the amount of your Claim or Interest, please contact:

> Kurtzman Carson Consultants, LLC
> 12910 Culver Boulevard, Suite I
> Los Angeles, California 90066
> Attn: Source Precision Medicine, Inc.
> (866) 381-9100

You may use the above contact information if you wish to obtain, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d), an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents.

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code and that the disclosures by the Debtor concerning the Plan have been adequate and have included information concerning all payments made or promised by the Debtor in connection with the Plan and the Chapter 11 Case. In addition, the Bankruptcy Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law, and under Bankruptcy Rule 3020(b)(2), it may do so without receiving evidence if no objection is timely filed.

In particular, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that (a) the Plan has been accepted by the requisite votes of all Classes of impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the dissent of one or more such Classes, (b) the Plan is "feasible", which means that there is a reasonable probability that the Debtor will be able to perform its obligations under the Plan and continue to operate its business without further financial reorganization or liquidation, and (c) the Plan is in the "best interests" of all holders of Claims or Interests, which means that such holders will receive at least as much under the Plan as they would receive in a liquidation under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court must find that all conditions mentioned above are met before it can confirm the Plan. Thus, even if all the Classes of Impaired Claims accept the Plan by the requisite votes, the Bankruptcy Court must make an independent finding that the Plan conforms to the requirements of the Bankruptcy Code, that the Plan is feasible, and that the Plan is in the best interests of the holders of Claims. These statutory conditions to confirmation are discussed above.

## A. Parties in Interest Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (a) the claim or interest is "allowed," which means generally that no party in interest has objected to such claims or interest, and (b) the claim or interest is impaired by the Plan. If the holder of an impaired claim or interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan. If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan and the plan proponent and need not solicit such holder's vote.

The holder of a Claim against the Debtor that is Impaired under the Plan is entitled to vote to accept or reject the Plan if (a) the Plan provides a distribution in respect of such Claim, and (b)(i) the Claim has been scheduled by the Debtor (and such Claim is not scheduled as disputed, contingent or unliquidated), or (ii) it has filed a Proof of Claim on or before the bar date applicable to such holder, or (iii) the Debtor, pursuant to sections 502(a) and 1126(a) of the Bankruptcy Rule 3018(a), and upon application of the holder of the Claim with respect to which there has been objection, temporarily allows the Claim in an amount that the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## B. Classes Impaired Under the Plan

Classes 1, 2 and 3 are Impaired under, and entitled to vote on, the Plan. Classes 4 and 5 will not receive any distribution on account of their Interests, and are deemed under section 1126(g) of the Bankruptcy Code to have rejected the Plan. Accordingly, the votes of holders of Interests in Classes 4 and 5 will not be solicited.

## XIV. CONCLUSION

This Disclosure Statement was approved by the Bankruptcy Court after notice and a hearing. The Bankruptcy Court has determined that this Disclosure Statement contains information adequate to permit holders of Claims and holders of Interests to make an informed judgment about the Plan. Such approval, however, does not mean that the Bankruptcy Court recommends either acceptance or rejection of the Plan.

## A. Hearing on and Objections to Confirmation

### 1. *Confirmation Hearing*

The hearing on confirmation of the Plan has been scheduled for August 26, 2005, at 2:00 p.m. Eastern Time, at the Bankruptcy Court, 824 North Market Street, Wilmington, Delaware 19801. Such hearing may be adjourned from time to time by announcing such adjournment in open court, all without further notice to parties in interest, and the Plan may be modified by the Debtor pursuant to section 1127 of the Bankruptcy Code prior to, during, or as a result of that hearing, without further notice to parties in interest.

### 2. *Date Set for Filing Objections to Confirmation*

The time by which all objections to confirmation of the Plan must be filed with the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington Delaware 19801 and received by the parties listed in the Notice of the Confirmation Hearing has been set for August 19, 2005. A copy of that Notice has been transmitted with this Disclosure Statement.

Dated:  July 27, 2005

SOURCE PRECISION MEDICINE, INC.
Debtor-in-Possession


_____/s/ Karl Wassmann____
By:  Karl Wassmann
      Chief Restructuring Officer